**Calvan VAIL et al.**

v.

**The BOARD OF EDUCATION OF the PORTSMOUTH SCHOOL DIS-TRICT et al.**

**Civ. A. No. 72–178.**

United States District Court,
D. New Hampshire.

Feb. 21, 1973.

George Bruno, New Hampshire Legal Assistance, Manchester, N. H., Robert Pressman, Center for Law and Education, Harvard University, Cambridge, Mass., for plaintiffs.

John C. Driscoll, Portsmouth, N. H., for defendants.

## OPINION

BOWNES, District Judge.

This is a students civil rights class action brought pursuant to 42 U.S.C. § 1983 in which the plaintiffs seek declaratory relief under 28 U.S.C. §§ 2201 and 2202 and injunctive relief for the alleged deprivations, under color of State law, of rights of public school students secured by the First and Fourteenth Amendments to the United States Constitution. Jurisdiction is based on 28 U.S.C. § 1343(3, 4).

Three basic constitutional issues are raised:

First, does the Portsmouth School Board rule forbidding "the distribution of non-school sponsored written materials within Portsmouth schools and on school grounds for a distance of 200 feet from school entrances" violate the First and Fourteenth Amendments to the United States Constitution.

Second, does the Portsmouth High School policy concerning outside speakers violate the First and Fourteenth Amendments to the United States Constitution.

Third, does the Portsmouth School Board suspension procedure whereby students are suspended without a prior hearing violate the Due Process Clause of the Fourteenth Amendment.

This is a class action maintainable under F.R.Civ.P. 23(b)(2). Plaintiff Vail is a twelfth grade student and plaintiff Mayo is an eleventh grade student at Portsmouth High School, Portsmouth, New Hampshire. The class consists of all of those students similarly situated to the named plaintiffs.

The defendants, all of whom are sued in their official capacities, consist of the Board of Education of the Portsmouth School District and all of the members thereof and James J. Cusick, Superintendent of Schools.

Plaintiffs' motion for a preliminary injunction was denied on September 29, 1972. A hearing was held on February 1, 1973.

## THE FACTS

The essential facts have been stipulated.

On November 12, 1969, the Board of Education of the Portsmouth School District adopted a rule forbidding "the distribution of non-school sponsored written materials within Portsmouth schools and on school grounds for a distance of 200 feet from school entrances." All of the students and the general public have been apprised of this rule. There have been in excess of eight suspensions of students for distributing leaflets without permission in violation of the rule.

Plaintiff Vail has been suspended three times for violating this rule. On June 2, 1970, plaintiff Vail and others were suspended from school for distributing written materials outside the front door of Portsmouth High School before the start of the school day, but while the school was open. On April 13, 1972, Vail was suspended from school for five days for "[d]istribution of leaflets on school property and/or grounds." On that same day, Larry Dukes was suspended from school for five days for "giving out leaflets on the school grounds Wednesday, April 12, without permission."

Rule 15 of the Discipline Code adopted by the Portsmouth Board of Education on August 25, 1970, reads in pertinent part as follows:

> Students who are defiant to school officials, including teachers, will be suspended for ten school days . . . .

On several occasions, school officials have told Vail that the distribution of written materials on school grounds constituted "defiance."

Prior to the March, 1972 presidential primary, a number of presidential candidates spoke at the Portsmouth High School during the school day. During these talks, representatives of the candidates distributed leaflets, stickers, and buttons within the school contrary to the School Board rule.

In early November, 1971, an attorney representing plaintiffs Vail, Mayo, and other students met with the Superintendent of Schools to discuss the distribution of literature at the Portsmouth High School. Specifically, the students asked that they be allowed to distribute the *Strawberry Grenade,* a local Portsmouth, New Hampshire, publication. On November 16, 1971, Attorney Johnson requested that the Board of Education place the matter of distribution of literature on the agenda of its next meeting. On November 23, 1971, Johnson met with the Board of Education and presented the views of the students he represented as to the distribution of literature at the school. The Board denied the petition presented by Attorney Johnson requesting that his clients (students) be allowed to distribute the *Strawberry Grenade* in the Portsmouth schools because the rule of November 12, 1969, prohibited such distribution and because the specific publication in question (November 11, 1971, issue of the *Strawberry Grenade)* "has no redeeming educational, social, or cultural value; that its distribution could substantially disrupt normal educational activities; and that its distribution might incite lawless action."

In the period prior to the March, 1972 New Hampshire presidential primary, a number of presidential candidates spoke in the Portsmouth High School during the school day. The speakers included Edmund Muskie, George McGovern, Samuel Yorty, Vance Hartke, and Paul McCloskey. In addition, a representative of Paul McCloskey spoke on behalf of Mr. McCloskey.

Shortly thereafter, plaintiffs Vail and Mayo attempted to secure permission for Andrew Pulley, Vice-Presidential candidate of the Socialist Workers Party, to speak in the school. Over a period of several weeks, contacts were made with the school principal, the faculty advisor to the Junior World Council (a club), and a student member of the Junior World Council. These persons made no definitive statement regarding Mr. Pulley's speaking at the school. At the suggestion of the school principal, Vail and Mayo made an appointment with Superintendent Cusick to discuss the question of Mr. Pulley's speaking in the Portsmouth High School. A meeting was held on April 5, 1972, during which Superintendent Cusick inquired about Mr. Pulley's age and the views of the Socialist Workers Party. In a memorandum dated April 5, 1972, Mr. Cusick denied the students' request on the grounds that Mr. Pulley was not a bona fide candidate, since he was not eligible to serve as Vice-President because he had not attained the age of thirty-five as required by Article 2, Section 1, Clause 5, of the United States Constitution.

No written rules were given plaintiffs during their efforts to secure permission for Mr. Pulley to speak. After this action was filed, defendants produced, at plaintiffs' request, undated rules concerning political candidates. In a document entitled "Rules and Regulations Governing the Guest Speakers for the Social Studies Department and Junior World Council," it is stated that "[c]andidates seeking political office who are bona fide candidates are given equal time."

In 1971–72 there were four speakers at the High School in addition to the specified candidates, including a man who spoke about religion and representatives of the V.F.W. and American Legion who discussed patriotism. Vail testified that on January 19, 1973, he spoke to the Principal of Portsmouth High

School with regard to the bringing of an anti-war speaker to the school. The principal suggested that a debate between a pro-war and an anti-war speaker might be arranged and told Vail to return with a concrete program for such a debate. Vail testified that no pro-war speaker could be located and that, therefore, the principal denied permission for any anti-war speaker to address the school.

The suspensions for periods up to five days that Vail and other students received for violations of the November 12, 1969, literature distribution rule were effected without any prior hearings. A suspended student receives a zero for school work missed and must have a form, entitled "No Make-up," signed by teachers upon returning to school. The daily absentee list designates by an "S" next to his or her name that a student is suspended. A copy of the notice letter informing parents of the suspension is placed in the student's permanent record file.

Other suspensions during the 1971–72 school year occurred for the following reasons: (1) "for stealing a wallet with money in it"; (2) "for making a derogatory remark about Mr. Bacon in front of the school in the presence of several students"; (3) "disruption of history class by excessive talking and disrespect for the teacher's authority"; and (4) "defiance and obscene language to a teacher."

## DISTRIBUTION OF LITERATURE

It is well settled that First Amendment rights are available to both students and teachers in the school environment as well as elsewhere. The Supreme Court in Tinker v. Des Moines School Dist., 393 U.S. 503, 506, 89 S.Ct. 733, 736, 21 L.Ed.2d 731 (1969), made this clear when it stated that neither "students [n]or teachers shed their constitutional rights to freedom of speech or expression at the schoolhouse gate." On the other hand, the Supreme Court in Tinker, supra, also emphasized "the need for affirming the comprehensive authority of the States and of school officials, consistent with fundamental constitutional safeguards, to prescribe and control conduct in the schools." At page 507, 89 S.Ct. at page 737. [Citations omitted.]

The Portsmouth School Board adopted a regulation on November 12, 1969, expressly forbidding "the distribution of non-school sponsored written material within Portsmouth schools and on school grounds for a distance of 200 feet from school entrances." Several students have been suspended from Portsmouth High School for distributing literature on school grounds in violation of this rule. What is presented by these facts is a direct collision between the students' exercise of their First Amendment rights and a rule of the school authorities.

When the constitutionality of a school regulation is questioned, the burden of justifying the regulation falls upon the school board. Tinker v. Des Moines School Dist., supra; Burnside v. Byars, 363 F.2d 744 (5th Cir. 1966). The test for curtailing in-school exercise of expression is whether or not the expression or its method of exercise "materially and substantially" interferes with the activities or discipline of the school. See Burnside v. Byars, supra, at 749; Tinker v. Des Moines School Dist., supra, at 509. And, of course, the authority of the school board to balance school discipline against the First Amendment by forbidding or punishing activity on school grounds cannot exceed its authority to forbid or punish in-school activity. See Shanley v. Northeast Ind. Sch. Dist., Bexar County, Tex., 462 F.2d 960, 968 (5th Cir. 1972), reh. denied (1972). The sole purpose of any literature distribution regulation is to prevent disruption and not to stifle expression.

The regulation assailed by the plaintiffs is a blanket prohibition against the distribution of all nonschool sponsored written materials. It does not reflect any reasonable, constitutional

standards of the First Amendment as applied to the orderly administration of high school activities. There is no intimation, let alone a requirement, that any proscribed "distribution" must interfere in a "material and substantial" way with the administration of school activity and discipline or with the rights of other students. The rule in question does not facially lend itself to any limitation in terms of intent, time, place, and manner of distribution of literature. Riseman v. School Committee of City of Quincy, 439 F.2d 148 (1st Cir. 1971). The regulation does not reflect any effort on the part of the School Board to minimize the adverse effect of prior restraint. Freedman v. Maryland, 380 U. S. 51, 85 S.Ct. 734, 13 L.Ed.2d 649 (1965); Riseman v. School Committee of City of Quincy, *supra.*

■ I find that the rule is unconstitutional as overbroad and that it violates the First Amendment right of freedom of speech of the plaintiffs. This ruling does not prevent the defendants from promulgating reasonable, specific regulations setting forth the time, manner, and place in which distribution of written materials may occur. This does not mean, however, that the School Board may require a student to obtain administrative approval of the time, manner, and place of the particular distribution he proposes. Rather, the Board has the burden of telling students when, how, and where they may distribute materials, consistent with the basic premise that the only purpose of any restrictions on the distribution of literature is to promote the orderly administration of school activities by preventing disruption and not to stifle freedom of expression. For example, the Board may provide that all leafletting is to take place outside of the school building or in the student lounge and in such a manner that regular classroom and other school activities are not interfered with.

■ Because the rule is unconstitutional, the suspensions under it cannot stand. Fujishima v. Board of Education, 460 F.2d 1355, 1359 (7th Cir. 1972); Quarterman v. Byrd, 453 F.2d 54 (4th Cir. 1971). In the present case, there is no evidence and no finding can be made that the suspended plaintiffs were disciplined because of the content of the publications being distributed. The letter (Attachments 5 and 6 to the Stipulation of Facts) announcing the suspensions of plaintiffs Vail and Dukes indicate that the reason for the suspensions was solely the "distribution of leaflets on school property and grounds."

Plaintiffs were denied permission to distribute the *Strawberry Grenade* in the Portsmouth schools not only because of the ban on the distribution of non-school sponsored literature, but also because the specific issue in question (November 11, 1971) was found to have "no redeeming educational, social, or cultural value; its distribution could substantially disrupt normal educational activities; and its distribution might incite lawless action."

■ Free speech under the First Amendment is not absolute, and the extent of its application may properly take into consideration the age or maturity of those to whom it is addressed. As Justice Stewart stated in his concurring opinion in Tinker v. Des Moines School Dist., *supra,* "the First Amendment rights of children are not co-extensive with those of adults." 393 U.S. at page 515, 89 S.Ct. at p. 741. It is generally held that the constitutional right to free speech of public secondary school students may be modified or curtailed by school regulations "reasonably designed to adjust these rights to the needs of the school environment." Antonelli v. Hammond, 308 F.Supp. 1329, 1336 (D.C. Mass.1970). Specifically, school authorities may exercise a reasonable prior restraint on the content of publications distributed on school premises during school hours only in those special circumstances where they can "reasonably 'forecast substantial disruption of or material interference with school activities'" on account of the distribution of such printed material. Eisner v. Stamford Board of Education, 440 F.2d 803,

806–807 (2nd Cir. 1971). A similar policy prevails where the printed material is obscene or libelous. See Shanley v. Northeast Ind. Sch. Dist., Bexar County, Tex., *supra*, at 970–971 of 462 F.2d.

■ I do not here delimit the categories of materials over which a high school administration may exercise a reasonable prior restraint of content, for I realize that specific problems will require individual and specific judgments. The *ad hoc* resolution of such issues, however, must be based on "reasonableness" and not upon the "undifferentiated fear or apprehension of disturbance," Tinker v. Des Moines School Dist., *supra*, 393 U.S. at 508, 89 S.Ct. at 737, nor upon dislike or disagreement with the views expressed in the written material.

■ The *Strawberry Grenade* is a periodical whose content may vary from issue to issue. Therefore, one cannot generalize about the periodical except to note that it is clearly not of high journalistic, literary, cultural, or educational standards. The sort of profanity and vulgarisms which appear in the November 11, 1971, issue of the *Strawberry Grenade*, however crude they may seem, do not compel a finding that the periodical is obscene. The words that appear in that issue are not used to appeal to prurient sexual interests, see Sullivan v. Houston Indep. School Dist., 333 F.Supp. 1149, 1162–1167 (S.D.Tex.1971), and fall without the prevailing legal definition of obscenity. See Roth v. United States, 354 U.S. 476, 77 S.Ct. 1304, 1 L.Ed.2d 1498 (1957), and Cohen v. California, 403 U.S. 15, 91 S.Ct. 1780, 29 L.Ed.2d 284 (1971), reh. denied, 404 U.S. 876, 92 S.Ct. 26, 30 L.Ed.2d 124 (1971).

■ The Portsmouth School Board found that the distribution of the November 11, 1971, issue of the *Strawberry Grenade* "*could* substantially disrupt normal educational activities" and "*might* incite lawless action." [Emphasis added.] The Board's "could" or "might" ruling does not comport with the controlling case law standards established in Tinker v. Des Moines School Dist., *supra*.

But, in our system, undifferentiated fear or apprehension of disturbance is not enough to overcome the right to freedom of expression. Any departure from absolute regimentation *may* cause trouble. Any variation from the majority's opinion *may* inspire fear. Any word spoken, in class, in the lunchroom, or on the campus, that deviates from the views of another person *may* start an argument or cause a disturbance. But our Constitution says we must take this risk, Terminiello v. Chicago, 337 U.S. 1, 69 S.Ct. 894, 93 L.Ed. 1131 and our history says that it is this sort of hazardous freedom—this kind of openness—that is the basis of our national strength and of the independence and vigor of Americans who grow up and live in this relatively permissive, often disputatious, society.

In order for the State in the person of school officials to justify prohibition of a particular expression of opinion, it must be able to show that its action was caused by something more than a mere desire to avoid the discomfort and unpleasantness that always *accompany* an unpopular viewpoint. Certainly where there is no finding and no showing that engaging in the forbidden conduct *would* "materially and substantially interfere with the requirements of appropriate discipline in the operation of the school," the prohibition cannot be sustained. Burnside v. Byars, *supra*, 363 F.2d at 749.

\* \* \* \* \* \*

On the contrary, the action of the school authorities appears to have been based upon an urgent wish to avoid the controversy *which might result* from the expression, even by the silent symbol of armbands, of opposition to this Nation's part in the conflagration in Vietnam. (393 U.S. at pp. 508–510, 89 S.Ct. at pp. 737, 738. Emphasis added, Footnote omitted.)

Therefore, the absolute ban on the distribution of the *Strawberry Grenade* in the Portsmouth schools cannot withstand constitutional attack as it constitutes an unreasonable prior restraint of freedom of expression. This ruling is not to be interpreted as judicial acquiescence in the views espoused by the *Strawberry Grenade* nor as judicial license to distribute all future issues of the periodical on school grounds. School authorities may, by appropriate regulation, exercise prior restraint upon publications distributed on school premises during school hours only in those special circumstances where they can "reasonably 'forecast substantial disruption of or material interference with school activities'" on account of the distribution of such printed material. Eisner v. Stamford Board of Education, *supra*, at 806–807, of 440 F. 2d. If a reasonable basis for such a forecast exists, it is not necesssary that the school stay its hand in exercising a power of prior restraint "until disruption actually occurred." Butts v. Dallas Ind. School Dist., 436 F.2d 728, 731 (5th Cir. 1971); Norton v. Discipline Committee of East Tenn. State Univ., 419 F.2d 195, 198 (6th Cir. 1969), cert. denied, 399 U.S. 906, 90 S.Ct. 2191, 26 L. Ed.2d 562 (1970); LeClair v. O'Neil, 307 F.Supp. 621, 625 (D.C.Mass.1969), aff'd. 401 U.S. 984, 91 S.Ct. 1219, 28 L. Ed.2d 524 (1971). But there must be substantial facts which reasonably support a forecast of likely disruption. For example, if on the basis of substantial reliable information, the school authorities believe that a given publication is pornographic or advocates destruction of school property or urges "physical violence" against teachers or fellow students, then the school officials would be justified in prohibiting the distribution of such material on school premises during school hours.

## OUTSIDE SPEAKERS

Although the speaker sought to be invited to the Portsmouth High School is not a plaintiff in this suit, the legal interests of the students who sought to invite Andrew Pulley and who would have made up part of the audience are sufficient to present a substantial legal controversy with the school authorities who denied permission for Pulley's appearance. Smith v. University of Tennessee, 300 F.Supp. 777, 780 (E. D.Tenn.1969); Snyder v. Board of Trustees of University of Illinois, 286 F.Supp. 927 (N.D.Ill.1968).

This particular issue involves the balancing of the rights of students protected by the First and Fourteenth Amendments of the United States Constitution and of the school officials to control and regulate public speaking on school property.

Freedom of speech encompasses the right to "receive information and ideas." Stanley v. Georgia, 394 U.S. 557, 564, 89 S.Ct. 1243, 22 L.Ed.2d 542 (1969); Lamont v. Postmaster General, 381 U.S. 301, 85 S.Ct. 1493, 14 L.Ed.2d 398 (1965). The First Amendment protection of free speech embraces the right to hear and, therefore, extends to listeners. Lamont v. Postmaster General, *supra*; Brooks v. Auburn University, 412 F.2d 1171 (5th Cir. 1969); Martin v. City of Struthers, 319 U.S. 141, 63 S.Ct. 862, 87 L.Ed. 1313 (1943).

The only speaker regulation in effect at the Portsmouth High School pertains to political candidates and reads as follows:

Candidates seeking political office who are bonafide candidates are given equal time.

Pulley was denied permission to speak because Superintendent Cusick was of the opinion that he was not a "bonafide" candidate.[1] The only standard in the regulation is that the potential speaker be a "bonafide candidate." While it may have been improper for the Superintendent to have made a determination as to who is a "bonafide candidate," the focus at this point (the election having

1. It is undisputed that Pulley was not eligible to serve as Vice-President in that he had not attained the age of thirty-five as required by Article 2, Section 1, Clause 5, of the United States Constitution.

passed) must be on the standards for non-candidates where there are apparently no rules.

While the school might bar all outside speakers, the interchange of ideas and beliefs that is fostered by providing a forum for outside speakers is healthy and beneficial to the entire educational process.

■ If the school provides a forum for outside speakers, as Portsmouth High School has done, it must do so in a manner consistent with constitutional principles. Access to the podium must be permitted without discrimination. It is not for the school to control the influence of a public forum by censoring the ideas, the proponents, or the audience. The right of the student to hear a speaker cannot be left to the discretion of school authorities on a pick and choose basis. Freedom of speech and assembly require that outside speakers be fairly selected and that equal time be given to opposing viewpoints.

■ The plaintiffs contend that there is persuasive evidence that school officials have discriminated against them in violation of the equal protection clause of the Fourteenth Amendment because of the refusal to allow Pulley to speak, because of the refusal to allow an anti-war speaker to address the school, and because of the allowance of proponents of religion and patriotism to speak. I am not convinced on the basis of this slim evidence that purposeful discrimination has occurred. The political candidate regulation purports to give equal time to opposing candidates. Furthermore, the Principal of Portsmouth High School indicated his evenhandedness by suggesting that if a debate between a pro-war and an anti-war speaker could be arranged, the school would provide a forum.

Because the election has passed, I am not constrained to order that Pulley be given an opportunity to address the students at Portsmouth High School. I do,

however, order that if the school continues to provide a forum for outside speakers, it do so in a manner consistent with the constitutional principles herein specified.

## SUSPENSION PROCEDURE

Plaintiffs also raise the constitutional issue of whether the Due Process Clause requires that a student be afforded notice and the opportunity for a hearing prior to his being suspended. Although the suspensions complained of are void because the rule that the plaintiffs violated and which was the basis for their suspensions is unconstitutional, this due process issue is not moot and is properly before the court.

The Portsmouth High School Discipline Code does not provide for any hearing prior to suspension. Suspensions for up to ten days are authorized under the Code in some instances, i. e., defiance to school officials and threats and intimidation to fellow students.[2] It is uncontradicted that the plaintiffs were suspended without a hearing for periods up to five days.

The following statutory provisions contained in New Hampshire Revised Statutes Annotated are relevant:

189:1 *Days of School.* The school board of every district shall provide standard schools for at least one hundred and eighty days in each year, . . . .

189:1–a *Duty to Provide Education.* It shall be the duty of the school board to provide, at district expense, elementary and secondary education to all pupils under twenty-one years of age who reside in the district, provided that the board may exclude specific pupils for gross misconduct or for neglect or refusal to conform to the reasonable rules of the school, . . . .

189:15 *Regulations.* The school board may, unless otherwise provided

---

2. See guidelines 15 and 16 for disciplinary action contained in the Portsmouth High School Student Handbook.

**602**

by statute or state board regulations, prescribe regulations for the attendance upon, and for the management, classification and discipline of, the schools; . . . .

193:1 *Duty of Pupil.* Every child between six and sixteen years of age shall attend [school] . . . .

193:13 *Suspension and Dismissal of Pupils.* The superintendent, or his representative as designated in writing, is authorized to suspend pupils from school for gross misconduct, providing that where there is a suspension lasting beyond five school days, the parent or guardian has the right to appeal any such suspension to the local board. Any suspension to continue beyond twenty school days must be approved by the local board. Any pupil may be dismissed from school by the local school board for gross misconduct or for neglect or refusal to conform to the reasonable rules of the school and said pupil shall not attend school until restored by the local board. Any dismissal must be subject to review if requested prior to the start of each school year and further, any parent or guardian has the right to appeal any such dismissal by the local board to the state board of education.

■■■ The requirements of procedural due process apply only to the deprivation of interests encompassed within the Fourteenth Amendment's protection of liberty and property. When protected interests are implicated, the right to some kind of prior hearing is paramount.[3] Board of Regents of State Colleges et al. v. Roth, 408 U.S. 564, 92 S.Ct. 270, 33 L.Ed.2d 548 (1972). But

the range of interests protected by procedural due process is not infinite.

■■■ While the meaning of "liberty" guaranteed by the Fourteenth Amendment has not been defined with precise exactness, the term has received much judicial consideration, and some of the rights included within it have been defined and stated. Without doubt, it denotes the right of an individual "to acquire useful knowledge," Meyer v. Nebraska, 262 U.S. 390, 399, 43 S.Ct. 625, 67 L.Ed.2d 1042 (1923).

■■■ The precise nature of the private interest sought to be protected here is the right of students to remain in attendance at a public school in order to obtain an education. It requires no argument to demonstrate that education is vital, and, indeed, basic to civilized society. Society now recognizes that public elementary and secondary school education is a state-granted constitutional right. See NH RSA 189:1–a and 193:1.

■■■ Having concluded that the plaintiffs' interest is one that is protected by the Due Process Clause, the resolution of the issue in this case depends in large part on whether the student's interest in having a prior hearing outweighs the school's interest in swift and summary adjudication for disciplinary purposes. Minimum procedural requirements necessary to satisfy due process depend upon the circumstances and the interest of the parties involved. Hobson v. Bailey, 309 F.Supp. 1393, 1402 (W.D. Tenn.1970).

If a school is to function properly, it is necessary that rules governing the conduct of students, which do not rise to the level of criminality, but which are

---

3. Before a person is deprived of a protected interest, he must be afforded opportunity for some kind of a hearing, "except for extraordinary situations where some valid governmental interest is at stake that justifies postponing the hearing until after the event." Boddie v. Connecticut, 401 U.S. 371, 379, 91 S.Ct. 780, 786, 28 L.Ed.2d 113 (1971). "While '[m]any controversies have raged about . . . the Due Process Clause,'

. . . it is fundamental that except in emergency situations due process requires that when a State seeks to terminate [a protected] interest . . ., it must afford 'notice and opportunity for a hearing appropriate to the nature of the case' *before* the termination become effective." Bell v. Burson, 402 U.S. 535, 542, 91 S.Ct. 1586, 1591, 29 L.Ed.2d 90 (1971).

designed to regulate the relationship between the school authorities and the students based upon practical and ethical considerations, be formulated and promulgated. It is now established that adequate notice of the prohibited conduct must be provided. The Student Handbook in this case does list various offenses for which discipline may be imposed.

 The point at which disciplinary actions becomes subject to constitutional scrutiny is when the action adversely affects the basic right of a student to an education. It is settled law that a school must afford some opportunity for a hearing when dealing with expulsions. See Dixon v. Alabama State Board of Education, 294 F.2d 150 (5 Cir. 1961); Knight v. Board of Education of City of New York, 48 F.R.D. 108, 111 (E.D.N.Y.1969); Baker v. Downey City Board of Education, 307 F.Supp. 517 (C.D.Calif.1969); Vought v. Van Buren Public Schools, 306 F. Supp. 1388 (E.D.Mich.1969). When the prospective discipline involved is a lengthy suspension, it is nearly equivalent in its adverse effect [4] upon the student as an expulsion and should, therefore, fall within the rule requiring a hearing. Madera v. Board of Education of City of New York, 386 F.2d 778, 784 (2nd Cir. 1967).

I am aware that if the temporary suspension of a high school student could not be accomplished without first preparing written specification of charges and giving notice of and holding a fair hearing, the discipline and ordered conduct of the educational program and the moral atmosphere required by good educational standards would be difficult to maintain. Therefore, it is only when

punishment by a lengthy suspension is to be imposed that the constitutional right to due process requires written specification of charges, notice, and a full prior hearing.

 I hold that due process requires at least an informal administrative consultation with a student before any suspension is imposed so that the student can know why he is being disciplined and so that the student can have the opportunity to persuade the school official that the suspension is not justified, e. g., that this is a situation of mistaken identity or that there is some other compelling reason not to take action. However, when a student is expelled or suspended for a period of more than five school days, minimal standards of procedural due process require the following:

1. The accused student and at least one of his parents or his guardian shall be furnished, either in person or by mail directed to the student's last known address, [a letter] with written notice of the charges and of the nature of the evidence against the accused student.

2. The accused student and at least one of his parents or his guardian shall be offered a formal hearing after sufficient time to prepare a defense or reply, at which hearing evidence in support of the charge shall be presented by school officials and the accused student or his parent or guardian shall have ample opportunity to present any defense or reply.

3. The decision of school officials to impose such discipline shall be based upon a dispassionate and

---

4. In addition to a suspended student receiving zeros for all work missed and being denied an opportunity to "make-up" the work, a copy of the notice of suspension is placed in the student's permanent record file. A lengthy or indefinite suspension may prevent the student from obtaining credit for a particular course or term and may well affect the grades received. In addition, the record of the suspension may jeopardize a student's future employment and educational opportunities as guidance counselors prepare student recommendations after having examined the student's permanent record file which contains the notice of suspension.

fair consideration of substantial evidence that the accused student committed the acts for which suspension is to be imposed and that such acts are in fact a proper reason for such suspension.

These minimal due process requirements are in addition to the statutory rights of appeal contained in NH RSA 193:13.

## ORDER

1. The defendants are enjoined from enforcing the present rule relative to the distribution of nonschool sponsored written materials.

2. All suspensions for the distribution of leaflets on school property and grounds are hereby voided, and it is ordered that defendants expunge the students' records of all such suspensions.

3. Written notice of the expungement is to be provided to all students who are affected by this action.

4. Counsel for the parties shall jointly review defendants' suspension records from the date of the adoption of the November, 1969, rule to the present to identify any additional suspensions for violation of the distribution rule, and such suspensions shall be expunged and the students so notified.

5. Counsel shall have the right to inspect school records to see to it that there has been compliance with this court's order.

6. The defendants are further ordered to study the records of all students affected by the suspensions to determine the impact, if any, of the policies of awarding zeros and denying make-up work because of suspensions. The defendants shall report to this court, and to opposing counsel, not later than thirty days after the date of this court's order, on the results of this review. The report shall cover:

(a) In general, the steps taken to comply with this paragraph;

(b) The impact, if any, of each suspension on the affected students' grades; and

(c) The feasibility, if and where an impact is shown, of adjusting grades and permanent school records.

7. The Portsmouth School Board is ordered to comply with the due process requirements set forth herein with regard to the suspension or expulsion of students from school.

8. Notice of the statutory provisions of NH RSA 193:13 shall be given to any student suspended for more than five days and to his parent or guardian.

9. The procedural requirements relative to suspensions and expulsions shall be made a part of the Student Handbook.

10. This opinion and order is to be posted on the school bulletin board in a prominent place, and copies of this opinion and order are to be made available to the students in the school library.

The court will retain jurisdiction pending compliance with this court order.