Shelley Lorraine **PETERSON** et al.,
Plaintiffs,

v.

The **BOARD OF EDUCATION OF SCHOOL DISTRICT NO. 1 OF LINCOLN, LANCASTER COUNTY, NEBRASKA**, et al., Defendants.

No. CV73–L–136.

United States District Court,
D. Nebraska.

Sept. 19, 1973.

James M. Kelley, Lincoln, Neb., for plaintiffs.

Willis Hecht, Lincoln, Neb, for defendants.

## MEMORANDUM OF DECISION

URBOM, Chief Judge.

The issue is whether a board of education of a public school may prohibit the distribution on school grounds of a "counter-culture" or "alternative" newspaper, in the face of the First and Fourteenth Amendments to the Constitution of the United States which declare that a state "shall make no law . . . abridging the freedom of speech, or of the press." For the reasons hereinafter outlined, I conclude that the answer

must be in the negative in the setting of the specific facts before the court.

Jurisdiction is predicated upon 28 U. S.C. § 1343, and the action is brought pursuant to 42 U.S.C. § 1983.

## FINDINGS OF FACT

The Gazette Publishing Cooperative, a nonprofit, unincorporated association formed for the purposes of editing, publishing and distributing a biweekly newspaper known as the *Lincoln Gazette,* has between ten and twenty members who receive no salary or other compensation from the Cooperative. The *Gazette* is a "counter-culture" or "alternative" newspaper, its purpose being to provide an outlet for news stories, editorial veiwpoints, social and artistic commentary which are either not treated at all or which are treated significantly differently by mass circulation newspapers. Little effort is made by the reporters and editors of the *Gazette* to confine editorial opinions to the editorial page.

The *Gazette* contains commercial advertisements for profit-making establishments and for commercial products, although advertisements for tobacco and liquor products are not published. Commercial advertisements for products and establishments are also found in the newspapers published by the four local high schools in the district, although advertisements for liquor products are not carried in these newspapers.[1]

The *Gazette* is distributed by unpaid volunteers, some of whom are members of the Cooperative, on a "free-or-donation" basis, at various locations within the city of Lincoln, including street corners, public and private shopping malls, and the campus of the University of Nebraska. "Free-or-donation" means that nonsubscribing recipents of the paper may have a copy free of charge, but donations by the recipients are accepted.

---

1. It should also be noted that the four high schools subscribe to various magazines and periodicals, including *Time, U. S. News & World Report, Teen,* and so forth, which contain commercial advertising. The periodicals are placed in the schools' libraries and apparently are accessible to all high school students.

Donations to the *Gazette* have been made by students at all four Lincoln high schools upon receipt of the paper.

During the early portion of the 1972–1973 academic year members of the Cooperative and their friends, including students enrolled in good standing at the public high schools of the district, attempted to and for a brief time did distribute copies of the *Gazette* at the outer entrances to all public high schools within the district. The *Gazette* was handed only to those students and school personnel who would accept it.

The defendant Lauterbach, principal of Southeast High School, at a meeting held in his office on August 31, 1972, informed representatives of the Cooperative that he was banning the on-campus distribution of the newspaper at Southeast High School. At or about the same time the defendant Huge, principal of East High School, banned the on-campus distribution of the *Gazette* for the reason that its distribution contravened school policy. The defendant Prasch, the Superintendent of Schools, concurred in the decision of the defendants Huge and Lauterbach to ban the on-campus distribution of the *Gazette*.

The plaintiff Kurtenbach met with the defendants Prasch and Ferguson, the Director of Publications for the school district, on September 1, 1972, to seek a reversal of the actions of defendants Lauterbach and Huge. He was informed by them that the actions of the two principals would be affirmed because the distribution of the *Gazette* was not in accordance with existing school policy relating to commercialism in the schools, solicitation of funds from students, visitors in schools, and selection of instructional materials.[2]

2. The decision of defendant Prasch was affirmed by the defendant Board of Education at a meeting held December 12, 1972, and the Board also affirmed the following statement offered by defendant Prasch:

"It is our belief that it is not the function of the public schools to become the vehicle for the indiscriminate distribution of printed material to students. Indeed, given the captive nature of the public school student body and the purposes for which they are gathered, school officials have a responsibility to maintain some control of the distribution of material. Provided this control is administered according to policy guidelines, we do not believe school officials should be accused of censorship when maintaining the required control since students have many other obvious accesses to printed materials.

"We have reviewed current policy statements and believe them to be reasonable and appropriate. We do not recommend that they be waived or changed in order to facilitate the distribution of *The Lincoln Gazette*."

The applicable regulations relating to the banning of the on-campus distribution of the *Gazette* are:

"III. Miscellaneous Building Regulations
A. Commercialism in the Schools

It is the general policy of the Board of Education that teachers, employees, and students should, neither by design nor through inadvertence, comprise a captive audience for the furtherance of a private business of any sort. In keeping with that policy, school buildings, grounds, and facilities may not be used for any sales solicitation, advertising campaign, or promotion of any commercial enterprise.

1. The Lincoln Public Schools shall at all times be free from commercial advertising and the distribution of materials to pupils for the purpose of advertising is prohibited.

2. Promotional literature of commercial programs or events sponsored by independent commercial concerns, local organizations, or civil groups shall not be distributed to homes through the pupils in the public schools.

a. Not-for-profit youth serving agencies may distribute materials through the schools to inform students or [sic] programs or events for youth, when cleared by bulletin from the central office and distributed according to instructions.

b. Promotional material for events sponsored by not-for-profit, non-denominational, and non-political civic organizations which are pertinent to students' interests may, at the principal's discretion, be posted in schools but not distributed to students.

3. No school programs or tickets of admissions to school activities shall carry free advertising.

4. Advertising in Student Publications

Student publications may accept advertising provided that a faculty sponsor, principal, or faculty board establishes standards and maintains control. Advertising for the following is not acceptable:

—Liquor or tobacco
—Theatrical attractions, except as specifically approved by the Superintendent of Schools

Later, at a meeting of the senior high school principals of the district, the district's policy with respect to the on-campus distribution of the *Gazette* was announced by the defendant Prasch, and it was related that the ban on the on-campus distribution of the *Gazette* extended to the grounds on which the schools were located, as well as to the buildings themselves. The ban did not extend to the mere possession of the paper by students or the casual handing of single copies from one student to another within the schools.

Since September 1, 1972, the defendants Deitrich, Lauterbach, Bogar and Huge have prevented members of the Cooperative, its friends and supporters, from distributing the *Gazette* on any portion of the campuses of the public high schools, but copies of the *Gazette* have been distributed to some students of the four high schools from areas adjacent to the high school campuses.

No student was expelled, suspended or subjected to official disciplinary action as a result of participation in the distribution of the *Gazette*, nor was any student denied the right to have the *Gazette* in his or her possession on the school campus and to read it there at any time when not engaged in class activities. The plaintiffs merely seek the right to enter upon the premises of the schools to distribute the *Gazette* at or near the outside of the entrances to the buildings in a manner so as not to impede traffic into or out of the school buildings.

## CONCLUSIONS OF LAW

At the outset, although not raised by the defendants, there is a question about standing. Among the named plaintiffs in this action are Sing-man Fen and Bernice J. Richmond, adult residents of Lincoln, who are not parents of students enrolled in the high schools and who are not members of the Cooperative. It does not appear that these two plaintiffs have standing to prosecute this action, because they have no demonstrable "stake" in the outcome of this lawsuit. Frothingham v. Mellon, 262 U.S. 447, 43 S.Ct. 597, 67 L.Ed. 1078 (1923); Flast v. Cohen, 392 U.S. 83, 88 S.Ct. 1942, 20 L.Ed.2d 947 (1968). There is nothing before me suggesting that plaintiffs Fen and Richmond would be directly affected by the resolution of this lawsuit and, accordingly they will be dismissed as plaintiffs to this action for lack of standing.

Another preliminary matter must be resolved prior to reaching the merits of the lawsuit. The plaintiffs have alleged, both in oral argument and in their brief, that there are three issues confronting the court, namely: (1) whether the ban on the on-campus distribution of the *Ga-*

—Dance halls
—Lotteries or other events carrying an element of chance
—Advertising in which art, composition, or content is salacious or in bad taste.
5. Displays
The Lincoln Schools may participate, at the principal's discretion, in displays as requested by reputable public organizations where there is no advertising or commercial gain connected with the exhibit.
B. Solicitations
The school facilities are not to be used to collect charity or other general contributions, except that school participation in the Community Chest and the Junior Red Cross is authorized.
1. All contributions are to be wholly voluntary, quotas are not to be used, and names or amounts collected are not to be published with regard to schools or individuals.

2. This regulation limits the sale of tickets through the schools to those sold for school activities.
3. In case parent organizations wish to take pictures of pupils, only group pictures shall be taken. There shall be no direct solicitation from students and commercial photographers' names shall not appear on the picture.

    \*      \*      \*      \*      \*

D. Visitors

1. All visitors to school must report to the school office at the beginning of their visit. Except for parents or legal guardians of students, all other visitation is by invitation and/or specific approval of the principal.

2. Children visiting in the city are not permitted to attend the Lincoln Public Schools unless they will attend more than fifteen school days."

*zette* constitutes an unconstitutional prior restraint on the plaintiffs' freedom of speech violative of the First Amendment; (2) whether the defendants' rules and policy relating to commercialism in the schools are overbroad in violation of the First and Fourteenth Amendments; and (3) whether the defendants' prior restraint of the plaintiffs' publication without procedural safeguards is violative of the Fourteenth Amendment. The defendants contend that the last two issues were not raised by the plaintiffs' complaint. It is clear that issue (1) was raised in paragraph 15 of the plaintiffs' complaint. Although the plaintiffs contend that issues (2) and (3) are raised by the language contained in paragraphs 16, 17 and 18 of their complaint, I am constrained to hold that the language of these three paragraphs does not speak of the issues of vagueness, overbreadth, or lack of procedural due process. Accordingly, I shall consider only the issue of whether the on-campus ban of the distribution of the *Gazette* constitutes a prior restraint on the plaintiffs' freedom of speech violative of the First Amendment.

There can be no question that First Amendment rights are fundamental and preferred. Dombrowski v. Pfister, 380 U.S. 479, 85 S.Ct. 1116, 14 L.Ed.2d 22 (1965). No state may interfere with them, unless it can show a compelling need for interference. Bates v. City of Little Rock, 361 U.S. 516, 80 S.Ct. 412, 4 L.Ed.2d 480 (1960); N.A.A.C.P. v. People of State of Alabama, 357 U.S. 449, 78 S.Ct. 1163, 2 L.Ed.2d 1488 (1958); Shelton v. Tucker, 364 U.S. 479, 81 S.Ct. 247, 5 L.Ed.2d 231 (1960). In Griswold v. Connecticut, 381 U.S. 479, 85 S.Ct. 1678, 14 L.Ed.2d 510 (1965), the Supreme Court of the United States declared:

". . . In other words, the State may not, consistently with the spirit of the First Amendment, contract the spectrum of available knowledge. The right of freedom of speech and press includes not only the right to utter or to print, but the right to distribute, the right to receive, the right to read (Martin v. [City of] Struthers, 319 U.S. 141, 143 [63 S.Ct. 862, 863, 87 L.Ed. 1313]) and freedom of inquiry, freedom of thought, and freedom to teach (see Wieman v. Updegraff, 344 U.S. 183, 195 [73 S.Ct. 215, 220, 97 L.Ed. 216])—indeed the freedom of the entire university community. Sweezy v. [State of] New Hampshire, 354 U.S. 234, 249–250, 261–263 [77 S.Ct. 1203, 1211, 1217–1218, 1 L.Ed.2d 1311] . . . Without those peripheral rights the specific rights would be less secure. . . ."

In Red Lion Broadcasting Co. v. FCC, 395 U.S. 367, 89 S.Ct. 1794, 23 L.Ed.2d 371 (1969), Mr. Justice White said:

". . . It is the purpose of the First Amendment to preserve an uninhibited marketplace of ideas in which truth will ultimately prevail, rather than to countenance monopolization of that market, whether it be by the Government itself or a private licensee. . . . '[S]peech concerning public affairs is more than self-expression; it is the essence of self-government.' . . ."

Nonetheless, the constitutional protection of speech and press is not absolute. There is no constitutional protection of obscenity. Paris Adult Theater I v. Slaton, 413 U.S. 49, 93 S.Ct. 2628, 37 L.Ed.2d 446 (1973); Miller v. California, 413 U.S. 15, 93 S.Ct. 2607, 37 L.Ed.2d 419 (1973); United States v. Orito, 413 U.S. 139, 93 S.Ct. 2674, 37 L.Ed.2d 513 (1973). Speech which tends to cause a breach of the peace by provoking the person addressed to acts of violence, Chaplinsky v. New Hampshire, 315 U.S. 568, 62 S.Ct. 766, 86 L.Ed. 1031 (1942), is not protected by the First Amendment from restraint by government. Suffice it to say that there is no claim here that the *Gazette* is obscene or is likely to incite its readers to violence within the meaning of the foregoing cases. Speech which presents a clear and present danger, Dennis v. United States, 341 U.S. 494, 71 S.Ct. 857, 95 L.Ed. 1137 (1951), or which is likely

to cause a substantial disruption of or material interference with school activities, Tinker v. Des Moines Independent Community School District, 393 U.S. 503 89 S.Ct. 733, 21 L.Ed.2d 731 (1969), also may be restrained by the state.

The claim here is that the state, acting through school officials, may restrict freedom of speech and press because (1) the *Gazette* constitutes commercialism, (2) distribution of the *Gazette* involves solicitation of funds from students, (3) distribution of it involves visitors in school buildings, and (4) the schools have a right to select instructional materials.

Points (1) and (2) may be examined together. With respect to commercialism and solicitation of funds as exceptions to the constitutional protection of speech and press, the only cases which I have found which in any way are supportive of the defendants' position are Valentine v. Chrestensen, 316 U.S. 52, 62 S.Ct. 920, 86 L.Ed. 1262 (1942); Pittsburgh Press Co. v. Pittsburgh Commission on Human Relations, 413 U.S. 376, 93 S.Ct. 2553, 37 L.Ed.2d 669 (1973); and Katz v. McAuley, 438 F.2d 1058 (C.A. 2nd Cir. 1971). The *Valentine* case establishes the principle that the state may prohibit on a public street the distribution of purely commercial and business advertising matter or commercial and advertising matter to which is attached, solely for the purpose of avoiding an ordinance banning commercial advertising matter, an expression of public protest. New York Times Co. v. Sullivan, 376 U.S 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964), commented on Valentine v. Chrestensen as follows:

". . . The Court in *Chrestensen* reaffirmed the constitutional protection for 'the freedom of communicating information and disseminating opinion'; its holding was based upon the factual conclusions that the handbill was 'purely commercial advertising' and that the protest against official action had been added only to evade the ordinance.

"The publication here was not a 'commercial' advertisement in the sense in which the word was used in *Chrestensen*. It communicated information, expressed opinion, recited grievances, protested claimed abuses, and sought financial support on behalf of a movement whose existence and objectives are matters of the highest public interest and concern. . . . That the Times was paid for publishing the advertisement is as immaterial in this connection as is the fact that newspapers and books are sold. . . ."

In Pittsburgh Press Co. v. Pittsburgh Commission on Human Relations, supra, the Supreme Court held that a newspaper could be prevented from using an advertising system whereby employment opportunities were published under headings designating job preference by sex, because, the court said, such advertisements were "purely commercial advertising." The distinction between the present case and the *Chrestensen* and *Pittsburgh Press Co.* cases is obvious. Here, the primary thrust of the *Gazette* is that of reporting information and the expression of opinion, whereas the commercial advertisements are only a minor part of the communication. The ban by the defendants of the *Gazette* has not been a ban of the advertisements, but a ban of the entire newspaper. The *Gazette* cannot be said to be "purely commercial advertising." Similarly, Katz v. McAuley, supra, which upheld a school's policy of prohibiting the solicitation of funds on school property for the defense of the "Chicago Eight," does not suggest that a school may prohibit distribution of a newspaper which carries some commercial advertisements. Two things must be said about *Katz:* First, the court was dealing only with the question of whether the lower court had abused its discretion in refusing to give preliminary relief; and second, the decision conceivably could be justified on the basis that the plea for donations was a purely commercial venture. That, again, does not fit the *Gazette*.

The dissemination of commercial advertisements and solicitation of funds within a publication devoted largely to expression of opinion and factual matter can scarcely be said to be an evil which, standing by itself, is in need of elimination. The defendants in this action seem to concede as much by their act of permitting publication of school newspapers in each of the four public high schools within the district. A cursory examination of numerous editions of the four school newspapers reveals that those newspapers contain at least three or four times as much commercial advertising as does the *Gazette*.[3] In that connection, the defendants quote from Adderley v. Florida, 385 U.S. 39, 87 S.Ct. 242, 17 L.Ed.2d 149 (1966), wherein it was said:

" . . . Nothing in the Constitution of the United States prevents Florida from even-handed enforcement of its general trespass statute against those refusing to obey the sheriff's order to remove themselves from what amounted to the curtilage of the jailhouse. The State, no less than a private owner of property, has power to preserve the property under its control for the use to which it is lawfully dedicated. . . . "

One trouble is that the school officials in the present case have not been "even-handed" regarding commercialism. While sanctioning it in school newspapers, prepared by students and distributed to students, it decries it in the *Gazette*, prepared in part by students and distributed to students. In its policy against solicitation the defendants also are scarcely even-handed. Direct solicitation of students is permitted by the Community Chest, March of Dimes, and Junior Red Cross. The fact that these solicitations represent "grandfather clauses" and are being gradually eliminated by the defendants, does not escape the point that the school officials cannot rely upon a claim of even-handed application of a policy against pure solicitations to justify banning a newspaper devoted almost entirely to disseminating opinions and information and incidentally to solicitation of funds. Furthermore, permitting such direct solicitations suggests that the defendants recognize that solicitations do not necessarily result or are not necessarily likely to result in any immediate interference with educational endeavors.

I am persuaded that before the school officials may ban the distribution of the *Gazette* in its present form they must meet the criterion of Tinker v. Des Moines Independent Community School District, supra—that is, that the prohibition of distribution of the newspaper "is necessary to avoid material and substantial interference with school work or discipline." A concern that it may so interfere or that others in the future may so interfere is not sufficient. Evidence is lacking that past or future distribution of the *Gazette* has or probably will encroach upon the orderly conduct of the schools.

The third reason assigned by the Superintendent of Schools[4] for preventing distribution of the *Gazette* was that distribution would be contrary to the policy of the schools regarding visitors in school buildings. The defendants do not deal with this issue separately in their brief, but perhaps it can be said that it is being argued that Adderley v. Florida, 385 U.S. 39, 87 S.Ct. 242, 17 L.Ed.2d 149 (1966), recognizes that a state may limit access to and use of school property by persons who have no legitimate purpose on the property in connection with the governmental function being carried out there, and that, as some of the distribution of the *Gazette* may be done by nonstudents, the school officials may deny those persons access to the school property. I acknowledge some sympathy for the idea that the schools

---

3. The school newspapers seem to have from 15 to 20 commercial advertisements in each edition, whereas the *Gazette* carries about 4 or 5 on the average.

4. This was in his meeting with the plaintiff Kurtenbach on September 1, 1972.

should be able to have reasonable rules and regulations as to who may come upon the school property, but I doubt that the concept answers the problem in this case. *Adderley* approved the expulsion from jailhouse grounds of persons who were held by the court to have been interfering with the operations of jail officials. In the present case there is no intention on the part of this court to deny the schools' ability to protect against interference of school operations or to provide regulations for the safety of students and school personnel. Thus, I find no fault with the present policy of requiring "all visitors to . . . report to the school at the beginning of their visit." However, the banning of distribution of the newspaper because it may involve visitors, without any showing that the mere having of visitors will disrupt the school or result in danger to other persons on the school grounds, is not constitutionally permissible.

The fourth reason for the ban is that the school should retain some ability to select instructional materials. I fail to see that the evidence points to the applicability of this contention. The school officials should, indeed, be permitted control over instructional materials, but there is not the slightest indication that the plaintiffs expect the *Gazette* to be used as an instructional material or that distribution of it on school grounds, as opposed to just off school grounds, would be likely to result in its being used as an instructional piece of literature.

The board of education and the school administrators must understand that nothing in this opinion or in the order which will follow is intended to prevent their fashioning reasonable regulations as to the time, place and manner of distribution of the *Gazette* and for the safety of persons on the school grounds.

Furthermore, if the *Gazette* hereafter becomes obscene or is calculated to incite its readers to violence, or interferes by the fact of distribution on school grounds, or by any other fact, with the class work or other orderly operation of the schools, or impedes traffic, the injunction is not effective to prevent its distribution.

This decision is consistent with the following cases: Burnside v. Byars, 363 F.2d 744 (C.A. 5th Cir. 1966); Scoville v. Board of Education of Joliet, 425 F.2d 10 (C.A. 7th Cir. 1970); Riseman v. School Committee of City of Quincy, 439 F.2d 148 (C.A. 1st Cir. 1971); Eisner v. Stamford Board of Education, 440 F.2d 803 (C.A. 2nd Cir. 1971); Sullivan v. Houston Independent School District, 307 F.Supp. 1328 (U.S.D.C.S.D.Texas 1969); Fujishima v. Board of Education, 460 F.2d 1355 (C.A. 7th Cir. 1972); Vail v. Board of Education of Portsmouth School District, 354 F.Supp. 592 (U.S.D.C.N.H.1973); Baughman v. Freienmuth, 478 F.2d 1345 (C.A. 4th Cir. 1973).

The plaintiffs' prayer for relief makes it clear that they seek only to be permitted to distribute and to receive "upon the campuses of but outside of the structures of the public high schools," and the relief, accordingly, is limited to that.

The requisites of a class action have been stipulated by counsel. Accordingly, I shall declare the action to be a class action, but limited to the class consisting of all students, parents of students, and persons desiring to distribute the *Lincoln Gazette*.

On inquiry by the court the defendant Board of Education specifically stated that that defendant was raising no issue as to whether it was a "person" within the meaning of the Civil Rights Act. The injunction, therefore, will run against it.