STATE OF MISSOURI, at the Relation of ST. LOUIS PUBLIC SERVICE COMPANY, a Corporation, Appellant, v. PUBLIC SERVICE COMMISSION OF THE STATE OF MISSOURI and TYRE W. BURTON, HENRY McKAY CARY, CHARLES L. HENSON, E. L. McCLINTOCK, and M. J. McQUEEN, as Members of said Public Service Commission, Respondents, and CITY OF SHREWSBURY, a Municipal Corporation, Intervener-Respondent, No. 44777—291 S. W. (2d) 95.

Court en Banc, June 11, 1956

*Gaylord C. Burke* for appellant.

*Glenn D. Evans,* General Counsel, and *Frank J. Iuen,* Assistant General Counsel, for Public Service Commission of Missouri and Tyre W. Burton et al., *June R. Rose* for Intervenor-Respondent, City of Shrewsbury.

[97] COIL, C.—This appeal is to review an order of the Public Service Commission (hereinafter called Commission) denying the application by the St. Louis Public Service Company (hereinafter called Company) to abandon its Mackenzie-Shrewsbury bus line. That line came into existence as the result of two prior Commission orders. A 1951 order in case No. 12,137 pertained to the Mackenzie "leg" and a 1953 order in case No. 12,550 dealt with the Shrewsbury "leg." While the Commission's reports and orders in those prior cases are not a part of the instant record, we take judicial notice of them because the instant case and the two prior cases are so related and interdependent as to make it necessary to refer to those prior cases for a proper understanding of the present case.

In case No. 12,137, as a result of a hearing on the complaint of some 530 persons alleging lack of adequate public transportation to serve a St. Louis and St. Louis County area in the vicinity of Watson and Mackenzie Roads, the Commission found that that area was "in need of and entitled to reasonable public transportation service and that the St. Louis Public Service Company should render such service" and ordered the Company on or before June 17, 1951, to establish reasonable motorbus service over Watson Road for a distance of .72 of a mile between the points of intersection of Watson and Jamieson and Watson and Mackenzie. As a result of that order, the Company inaugurated a shuttle service between the points directed and at all times herein mentioned has continued to operate the Mackenzie "leg."

In case No. 12,550, on application of the City of Shrewsbury, a hearing on June 18, 1953, resulted in Commission findings "that public convenience and necessity requires the establishment of service over the route proposed," that such service should be rendered by the St. Louis Public Service Company, and an order that the Company inaugurate and operate passenger bus service over the route therein described; provided, that if such service was to be a "shuttle service" it should be rendered at not less than 30-minute headways in each direction, but that if the service was to be rendered by the extension of an existing line, the Company would conform its headways and service to those in existence on the line extended; and, provided further, that the service ordered was to continue "for an experimental period of 90 days and thereafter until this Commission shall otherwise order, and during the said period the said St. Louis Public Service Company shall make a written report at least every 30 days to this Commission and to the Mayors of Shrewsbury and Webster Groves showing the revenues and expenses of this operation exclusive of administration

and depreciation expenses." Jurisdiction was retained to permit the Company to be heard after the expiration of the 90-day experiment on the proposition of a discontinuation of the service ordered.

As a result of that unappealed order, the Company chose to extend the Mackenzie service over the Shrewsbury route directed and thus in compliance with Commission's order, rendered that service on the same headways and schedules as those then in existence on the Mackenzie "leg." Consequently, since January 9, 1954, there has been in existence the 2.95-miles-long Mackenzie-Shrewsbury bus line over this route: From Watson Road and Mackenzie Road, east on Watson Road to Chippewa Street, thence continuing east on Chippewa Street to Jamieson Avenue, northwardly on Jamieson Avenue to Lansdowne Avenue, west on Lansdowne Avenue to Murdoch [98] Cut-off, thence continuing west on Murdoch Cut-off and Murdoch Avenue to Laclede Station Road, northwardly on Laclede Station Road to Big Bend Boulevard, southwestwardly on Big Bend Boulevard to Lockwood Avenue, westwardly on Lockwood Avenue to Bompart Avenue, southwardly on Bompart Avenue to Big Bend Boulevard, northeastwardly on Big Bend Boulevard to Lockwood Avenue, thence returning over the same route.

The seven-days-a-week service rendered included: Sunday service on 30-minute headways from 1:15 p.m. to 7:15 p.m., Saturday service on 30-minute headways from 5:45 a.m. to 7:30 p.m., and Monday through Friday service on 30-minute headways from 5:45 a.m. to 7:30 p.m., except for 15-minute headways from 6:15 a.m. to 8:45 a.m. and from 4:45 p.m. to 6:15 p.m.

The Company's application in the instant case, filed May 19, 1954, after the service had been rendered for more than 120 days, alleged that the operation demonstrated that there was no public need for the entire Mackenzie-Shrewsbury bus line; that, because of operating losses sustained and being sustained, the continued operation of the line was an unreasonable burden on the Company's entire transit system; and that, because the Company was not making a fair return on its property used in public service, continued operation of the line amounted to a confiscation of the Company's property in violation of federal and state constitutional provisions. The prayer of the application asked authority to abandon the Mackenzie-Shrewsbury line "and for such other and further relief as may be meet and proper under the circumstances * * *."

■ We first note the Company's contention that the Commission's instant report and order do not conform to the requirements of Section 536.090 of the Administrative Procedure Act (all section references are to RSMo 1949, V.A.M.S.) in that the report does not include separately stated findings of fact and conclusions of law or a concise statement of the findings on which the Commission based its order. Section 536.090 does, as the Company contends, require that the order

in a case like the instant one shall contain or be accompanied by separately stated findings of fact and conclusions of law, including a concise statement of the findings on which the Commission based its order. The report contains the words, near its beginning, that "From the record made in this proceeding we find the following facts: * * *." Interspersed among those findings, however, is a general review of the evidence adduced. Thereafter, the report proceeds under the heading "Conclusions," which contains the Commission's observations but which includes the findings of the essential facts upon which the Commission based its order. Those conclusions included whatever conclusion of law was necessary (if there was any conclusion of law necessary in this particular proceeding as distinguished from a conclusion in the nature of one of mixed law and fact). For our purposes, the decisive matter is that we have no difficulty in determining from the Commission's report and order the findings upon which that order was based, and, consequently, we hold that the report and order in this case, considered as a whole, are sufficient for our review and that no purpose would be served by remanding to the Commission for a more formal and literal compliance with the provisions of Section 536.090.

As a matter of fact, the Company does not dispute or object to the finding of any evidentiary fact made by the Commission for, indeed, the essential evidentiary facts so found were undisputed and were substantially the facts presented by the Company to support its application. Company's basic contentions are that there was no finding or conclusion by the Commission that public convenience and necessity required the continued operation of the bus service, and that there could not have been any such lawful or reasonbale conclusion or finding based upon the evidentiary facts found by the Commission. As we shall later demonstrate, those contentions are untenable under the particular issues presented by this appeal.

The view we take of this appeal makes it unnecessary for us to set forth a resumé of the evidence. It is sufficient for our purposes [99] to summarize the Commission's ultimate factual conclusions, based, as we have said, upon essentially undisputed evidence. Although the Commission did not set forth its findings and conclusions in the form in which we now summarize them, yet there is no doubt that these were the Commission's essential conclusions, and that each of them substantially appears in the Commission's report and order.

The Commission made these findings and reached these conclusions: (1) that the application before it raised no issue (and obviously not) involving the matter of Company's system-wide rates including the question of zone fares for the Mackenzie-Shrewsbury line; (2) that the Mackenzie-Shrewsbury line operated at a loss during the period January 9, 1954 (its inauguration) to May 31, 1954, and that the loss was such that the revenue received was not sufficient to provide even the actual out-of-pocket cost of the service, much less to provide enough

revenue to cover the total cost of the service of the line's proportionate share of the cost of the Company's entire operation; (3) that the cost of furnishing service on the Mackenzie-Shrewsbury line is now being paid in part by the Company's patrons who are transported by Company's profitable lines; (4) that the evidence did not cause the Commission to believe that any change in the mode or method of providing essentially the same service would result in an increase of revenue sufficient to equal the Company's out-of-pocket cost, and that, consequently, the continued operation of the line in the foreseeable future would remain a loss operation; (5) that the Company's rate of return for its entire operation, depending upon the method used to arrive at the figures upon which that rate of return was based, was either 3.11% or 4.74% or 5.1%; (6) that, based upon the evidence adduced at the hearing and taking into account the Commission's knowledge of the Company's problems, the Company's operation of a particular line which results in an unreasonably disproportionate loss should either be so changed in method of operation as to substantially reduce the loss to a point where that loss is no longer prohibitively disproportionate, or the particular operation abandoned and service thereby discontinued, and this, even though such might result in some serious inconvenience to a relatively few people who, under different circumstances, would be entitled to transportation service by the line abandoned; (7) that the operation of the Mackenzie-Shrewsbury line at the time of the hearing showed an annual loss, based upon the excess of out-of-pocket expense alone over revenue, of $16,000 a year; that the Company's evidence showed that such loss might be reduced to approximately $9,000 annually by curtailing or reducing the service furnished (i.e., by eliminating the rush-hour 15-minute headways and furnishing service on 30-minute headways only, and by eliminating all Sunday service); that whether the present loss would in fact decrease to any particular amount would depend on entirely speculative and presently undeterminable factors; (8) that if the loss were reduced sufficiently, then, taking into account only the small segment of the entire system under present consideration as opposed to a consideration of system-wide rates, the same public convenience and necessity (theretofore found to exist in the unappealed orders in cases Nos. 12,137 and 12,550) still existed and might require the continuation of the reduced service even though the rendering of that service would continue to be a loss operation; (9) that the proposed curtailment of service would not substantially affect the adequacy of transportation service for the areas in question; (10) that the best way to determine with any degree of certainty the over-all effect of the curtailed service on the line's operation was to experiment for a further minimum period of 90 days, after which, if the Company so desired, the Commission, based upon all the evidence at that time,

would determine the basic question of abandonment or no abandonment.

As we view it, the Commission's instant report and order were in reality a method or process used by the Commission to obtain additional evidence by further experimental operation under curtailed service. This additional evidence, so obtained, was to be considered by the Commission in any final determination of the issue as to the [100] Company's contention that the service should be discontinued. Thus, it would appear that we need to determine whether the Commission had the authority to enter such an order, i.e., to use such a method, and, if so, whether it was unreasonable for the Commission to postpone a final decision on the abandonment issue until it had before it the results of the 90-day experimental operation under curtailed service. True, the application to abandon was denied, but it is clear that the denial was not in the nature of a final denial. The Commission said to the Company, in effect, we are not ready to finally determine whether you are entitled to an order permitting you to abandon the line because, in our opinion, additional relevant evidence will be available on that issue as a result of at least 90 days further experimental operation under curtailed service.

If the Commission's general regulatory authority as to the Company contemplated such an order as incidental and necessary to the exercise of the Commission's jurisdiction to authorize or deny an abandonment of one of the Company's lines, then we should reach the apparent conclusion that to require a further 90-days' experiment could not have been unlawful or unreasonable. This, because whether a final order denying abandonment would or would not be unlawful as constituting confiscation of the Company's property and denying it due process and whether such final order would or would not be unlawful and unreasonable because not supported by the weight of the evidence, it is abundantly clear that merely requiring the Company to operate a small segment of a total transit system for 90 days under changed conditions of service and for the very purpose of gathering additional evidence to finally determine the very matters which involve Company's instant contentions could not, in any view, be unlawful or unreasonable. In this connection, however, we point out that we are cognizant of the fact that the Commission could, by the device of successive orders for additional experimental operations, so indefinitely postpone any final determination and review as to make the very procedure unlawful, unreasonable, and unduly burdensome to the Company by requiring a succession of hearings. No such issue is before us in this case.

We are of the opinion that the Commission may, within the limitations of lawfulness and reasonableness suggested above and undoubtedly others, enter an order like the instant one for the purpose of obtaining additional evidence upon which to base a subsequent order

authorizing or denying abandonment of a bus line. True, there is no provision of the law under which the Commission operates which spells out in exact words that authority. But the Commission is charged generally and specifically with supervision and regulation of the Company and "it is within the powers and jurisdiction of the public service commission, under the powers granted that body by the Legislature, to grant to or withhold from a street railroad the right and power to abandon a part or spur of its existing line, * * *." State ex rel. City of Kirkwood v. Public Service Commission, 330 Mo. 507, 518[1], 50 S.W. 2d 114, 118 [1-3]. It follows that the Commission, in the exercise of the power to grant or deny Company's application to abandon, must have authority to effectively perform that duty through an order like the instant one. State ex rel. and to Use of Public Service Commission v. Padberg, 346 Mo. 1133, 1137[3], 145 S.W. 2d 150, 151[3]. (See also State ex rel. Campbell Iron Co. v. Public Service Commission, 317 Mo. 724, 731, 296 S.W. 998, 1000 [1, 2], as to validity of "test orders" as the best way to determine the reasonableness of rates fixed by the Commission, and State ex rel. Pitcairn v. Public Service Commission, 232 Mo. App. 535, 549, 111 S.W. 2d 222, 230[8], where the court held that an order in the nature of an experimental test order to determine whether applicant's proposed extension of a bus line would result in increased revenue sufficient to insure a profitable operation and meet requirements of public convenience and necessity, was a proper exercise of the Commission's authority.)

■ Company also contends that the instant order was in excess of the Commission's authority in that it "invaded the province of management" by directing the [101] details of the service to be rendered. It is Company's position that while the Commission is authorized by statute to prescribe the details of service such as headways, type of equipment, etc., in cases in which the Commission itself has investigated, or someone has complained of, the adequacy of existing service, there is no authority conferred upon the Commission, in a case where the issue is whether abandonment of service is justified, to order, in the event of denial of abandonment, the details of future service to be rendered.

What we have said heretofore with reference to the true nature of the instant order in effect disposes of this contention. If, as we have said, the purpose of the order was to discover the result of a particular type of service to furnish a further evidentiary basis for a final determination as to abandonment, then, clearly, the Commission's order to be effective must have required the particular service which was to be the subject of the experimental operation.

We, therefore, do not reach or decide the question of whether the Commission may in an order finally denying abandonment prescribe the details of the future service the Company is to render. (We

do point out, however, that in the instant case the curtailed service ordered was in the nature of "relief" to the Company [it was less than that being rendered], and that Company's application prayer was not only for authority to abandon, but also "for such other and further relief as may be meet and proper under the circumstances.")

The view we have taken of this case makes it unnecessary to discuss generally the scope of judicial review of orders of the Public Service Commission, even though clarification of that entire question would appear desirable in a case squarely involving that issue. We do, however, consider it appropriate at this time to point out that some of the statements, pertaining to the scope of judicial review, appearing in a per curiam opinion in the case of Kansas City v. Rooney, 363 Mo. 902, 254 S.W. 2d 626, are erroneous. In that case the effect of this language of Article V, Section 22, Mo. Const. 1945. (providing for a judicial review of decisions, findings, rules and orders of administrative officers and bodies) was considered: "and such review shall include the determination whether the same are authorized by law, and in cases in which a hearing is required by law, whether the same are supported by competent and substantial evidence upon the whole record." It was held in Rooney that the scope of review so provided was preclusive and that Wood v. Wagner Electric Corp., 355 Mo. 670, 197 S.W. 2d 647, had held that "all previous statutes are amended by substituting the provisions of Section 22, Article V, for any scope of review previously stated, because the constitutional standard of review 'is mandatory and requires no legislation to put it into effect.' " 254 S.W. 2d 627[1].

And it was further stated in Rooney that review of the decisions of a county court "are now on the same basis as review of awards of Workmen's Compensation or orders of the Public Service Commission. As we recently pointed out in Michler v. Krey Packing Co., Mo. Sup., 253 S. W. 2d 136, 142, decisions of administrative tribunals are not reviewed de novo because courts have no authority to make findings of fact in such cases." 254 S.W. 2d 627 [2, 3].

An examination of the Wood case, supra, will demonstrate that it did not hold that "all previous statutes are amended by substituting the provisions of Section 22, Article V, for any scope of review previously stated." On the contrary, Wood specifically recognized and so stated that the provision in Section 22, Article V, 1945 Constitution, was a "minimum standard" for judicial review. That holding was correct. In other words, Wood correctly recognized that, irrespective of what scope of judicial review of administrative decisions was provided by existing or future statutes dealing with specific agencies, the scope of review would in any event be as broad as that minimum review provided for by the constitution. And Wood, again correctly, held that any statute providing for a narrower scope of review was no longer effective because of the constitutional provision noted. Wood

did not say or imply that an existing or future statute providing for a broader scope [102] of judicial review than that stated in Article V, Section 22, was or would be invalid.

It would seem too plain for serious question that the legislature had and has the power and authority to provide for any scope of judicial review it may desire, so long as the provisions made are not in conflict with or repugnant to the federal and state constitutions. And so it is, that the second statement from the Rooney case quoted above is also, in part, clearly erroneous because, for the reasons noted, it is not true that the same scope of judicial review is applicable to the decisions of *all* administrative agencies.

However, what we have said does not mean necessarily that Rooney was incorrect in the conclusion there reached that Section 49.230, applicable to county courts when they were judicial courts, does not determine the scope of review on appeals from county courts since their change in status under the 1945 Constitution.

The effect of Article V, Section 22, Mo. Const. 1945, is, that every judicial review of a decision, finding, rule, or order of an administrative officer or body mentioned therein shall be at least as broad in scope as the minimum standard there prescribed, to wit: "shall include the determination whether the same are authorized by law, and in cases in which a hearing is required by law, whether the same are supported by competent and substantial evidence upon the whole record." The scope of review there provided is not preclusive and, therefore, does not mean that a broader scope of judicial review of an administrative decision may not be otherwise provided by law.

For the reasons heretofore stated, the judgment of the Circuit Court affirming the Commission's order is affirmed.

PER CURIAM:—The foregoing opinion by COIL, C., is adopted as the opinion of the Court en banc. All concur.