**James E. HARROD and Lloyd Buchanan, Plaintiffs-Appellants,**

**v.**

**BOARD OF EDUCATION, CITY OF ST. LOUIS, et al., Defendants-Respondents.**

No. 34426.

Missouri Court of Appeals,
St. Louis District.

Sept. 18, 1973.

Charles R. Oldham, St. Louis, for plaintiffs-appellants.

James S. McClellan, St. Louis, for defendants-respondents.

DOWD, Chief Judge.

This case is before us on rehearing. The original opinion reversed the judgment of the Circuit Court. The rehearing was held before the Court en banc. The Circuit Court of the City of St. Louis affirmed the decision of the Board of Education of the City of St. Louis, hereinafter referred to as the Board, wherein the Board permanently terminated the employment of James E. Harrod and Lloyd Buchanan, hereinafter referred to as appellants, as tenured teachers. This appeal resulted.

The case was submitted to the trial court upon the transcript of the proceedings before the Board, including all exhibits.

The appellants were originally charged by the Board as follows:

"It is charged that on and prior to Thursday, February 12, 1970, you, acting alone and in concert with others, caused, suffered, and permitted a program to be presented to the student body, which was obscene and calculated to inflame racial discord and incite the students to riot and violence; that in causing, suffering, and permitting this program to be so presented, you acted in disregard of your duties and in disobedience of the school administration and that you have continually for a protracted period of time condoned and encouraged disrespect of the school administrators and sought to foster racial disharmony, tension and disruption in the school."

At the request of the attorney for the teachers more specific charges were made which read as follows:

"More specifically, it is charged that in February, 1969, on the occasion of the presentation of an auditorium program at Beaumont High School by the Afro-American student group (now known as Black Student Alliance) you, as one of the sponsors of the group, assisted in the presentation of a program, which was not only obscene and calculated to inflame racial discord and hatred, but was in direct contravention of the instructions given you by the principal of the school in that it allowed active participation of persons who were not students at the School; that in connection with the presentation of another auditorium program presented on February 12, 1970, by the same group now known as the Black Student Alliance, you, as one of the sponsors, were cautioned by the Principal not to permit the development of another program similar to the one presented the previous year, but that, acting contrary to such instructions, you did, in fact, permit the development of a similar program, setting in motion the forces which resulted in the presentation of a program as inflammatory and obscene as the previous one, inciting the students to riot and violence.

"It is further specifically charged that throughout the period that you have acted as a sponsor of the Black Student Alliance, known originally as the Afro-American Group, you have, in disregard of the responsibilities imposed upon you as a sponsor, condoned the development and growth among these students of racial discord and hatred.

"It is further specifically charged that you encouraged disrespect of the school administrators by absenting yourself from your classroom, leaving your class unattended, and by encouraging the students in your charge to act contrary to the directions of the administrators.

"All of the matters stated above have created tension and disruption in the school. Your acts were in disregard of your responsibilities and duties both as a teacher and as a sponsor of a student activity, contrary to the Regulations approved by the Board of Education for

the conduct of the schools, particularly Regulations 2.330, 3.100, 3.240 and 3.330 of the Department of Instruction, Secondary Division."

After a hearing, before the Board, the Board filed the following statement of its proceedings, findings of fact, conclusions of law, and a memorandum opinion:

"BEFORE THE BOARD OF EDUCATION OF THE CITY OF ST. LOUIS STATE OF MISSOURI

"WILLIAM KOTTMEYER, Superintendent of Schools,

v.

JAMES E. HARROD and LLOYD BUCHANAN, Teachers

"Dr. William Kottmeyer, Superintendent of Schools, suspended two teachers at Beaumont High School, St. Louis, on February 12, 1970, on recommendation of the Administrators directly involved, because of disruption at the School which required it to be closed for a period of nearly ten days. The two tenured teachers, Messrs. Harrod and Buchanan, now under suspension, appealed to the Board of Education and requested a public hearing of their appeal of the Superintendent's decision under the provision of Sec. 168.221 R.S. Missouri 1959. Throughout the proceedings, the two tenured teachers are referred to as Appellants.

"Pursuant to proper notice, a formal public hearing was held starting at 2:30 p. m. on April 9, 1970. The Superintendent to Schools was represented by James S. McClellan, as special counsel. The appellants were represented by Charles R. Oldham and Joseph McDuffie as co-counsel. Nine of the twelve members of the St. Louis Board of Education including its president, who presided, were present throughout all the sessions. Two other Board members were forced to miss portions of the hearing, but have read the written transcript of the testimony that they did not hear in person. One Board member, Mr. James E. Hurt, Jr., heard only the first day's proceedings but has read the entire transcript of the testimony. Depositions of numerous witnesses had been taken before the hearing began and examination and cross-examination was exhaustive. The Superintendent introduced 19 exhibits and Appellants introduced 28 exhibits. Altogether 9 witnesses appeared for the Superintendent and 12 witnesses for the Appellants. The hearing lasted all or parts of the seven days, being finally terminated with forty minute oral arguments on June 3, 1970.

"The Board, being fully advised in the premises, and having given full consideration to the testimony and arguments of counsel, finds, as follows:

"FINDINGS OF FACT

"1. Racial tension has existed for some years in Beaumont High School and administrators have endeavored to promote racial harmony.

"2. Appellants were sponsors of a student group called the Black Student Union (formerly Afro American Club.)

"3. An auditorium session produced by Afro American Club in 1969 was racist, inflammatory, and promoted racial disharmony resulting in school disruption.

"4. The 1969 auditorium session had a divisive effect on students, faculty, and parents. Many objected to the presentation and to the sponsors of presentation.

"5. Following the 1969 auditorium session, the Principal told the sponsors that he was hurt and shocked by the presentation.

"6. Prior to a scheduled 1970 auditorium session, Appellants were warned to avoid repetition of the 1969 type program and that they would be held responsible for results.

"7. Auditorium session produced by Black Student Union in 1970 promoted racial disharmony, and resulted in fire, injuries and closing of school for substantial period of time.

"8. After 1970 incident, District Superintendent, Assistant District Superintendent, Principal and all three Assistant Principals informed Superintendent Kottmeyer that Appellants should be suspended immediately.

"9. Inflammatory pictures were posted on wall of Room 104, home of Black Student Union, for period of time.

"10. Notwithstanding expert testimony that skits presented at auditorium sessions would not inflame racial disharmony, resulting disturbances did occur immediately following such sessions in both 1969 and 1970.

"CONCLUSIONS OF LAW

"1. Racial disharmony and disrespect for administration of school resulted from activities of the Black Student Union.

"2. Sponsors of student groups are responsible for assuring that activities of such groups are in harmony with objectives of school administration and Board of Education.

"3. Appellants warned after the 1969 incident, and, again prior to the 1970 incident, are held responsible for disregarding instructions in permitting disruptive 1970 auditorium presentation to occur.

"4. The Superintendent of Schools was justified in suspending immediately tenured teachers upon advice of District Superintendent, Assistant District Superintendent, Principal and three Assistant Principals.

"5. Suspension and permanent termination of service of Appellants is upheld under the facts as presented because Appellants failed to discharge their responsibilities as teachers and sponsors of a student activity, contrary to the Regulations approved by the Board of Education for the conduct of schools, particularly Regulation 2.-330, 3.100, 3.240 and 3.330 of the Department of Instruction, Secondary Division."

We have set out the Board's memorandum opinion to demonstrate the basis for the Board's decision.

"MEMORANDUM OPINION

"Three charges were made by the Superintendent as set forth in the amplification of charges requested by counsel for the Appellants: "One, disregard of the instructions of the school administration in permitting unsuitable programs to be presented by the Black Student Union (formerly Afro-American Club) in both 1969 and 1970. As indicated in our Findings of Fact and Conclusions of Law, this charge in our opinion is fully supported. Two, condonation of the development and growth of racial disharmony. In view of the skits presented in the auditorium session in 1969 and again in 1970, the inflammatory speeches delivered by the students, the misuse of the microphone at the 1970 session, and the inflammatory nature of many of the posters carried on the Room 104 Bulletin Board, in our opinion this charge also is fully supported. Charge Three, the alleged absence from the classroom without permission, was denied at the hearing. There was conflict of testimony and possible confusion as to what permission had been granted by the Principal to be absent from the classroom. Some members of the Board felt that this charge was not fully sustained. After discussion, it was agreed that the allegations in such charge would be

omitted from our Findings of Fact and hence would have no bearing on the conclusions reached.

"Detailed summary of the testimony and the weight given to each witness would seem unnecessary. Minor conflicts in testimony appeared but, in our opinion, the Findings of Fact are fully justified by the preponderance of the testimony. Assistant District Superintendent Gregory's written report of the 1970 incident (Exhibit S-19) (Tr. 142) was fully corroborated by other witnesses. There was substantial agreement as to what happened in 1969 and 1970. Although witnesses disagreed on certain details of the Ku Klux Klan scene and the precise language used, in our opinion the consensus as agreed to by virtually all the witnesses actually present at the auditorium sessions warrants our conclusion that these presentations were racist and highly inflammatory in nature, contained obscene and vulgar language, and were unsuitable for showing in a high school auditorium program in a school marked by racial tension. Appellants produced three expert witnesses: Mrs. Evans, Mr. Brown and Dr. Kirkland, who testified on hypothetical questions that the text of the skits was not objectionable. Some of the Superintendents' witnesses, on cross-examination, agreed that the texts of the skits were unobjectionable. However, the assistant Principal in charge, Mrs. Brasfield, and several other highly competent witnesses, disagreed considering the context in which the skits were to be presented. We feel the expert witnesses' testimony and the supporting comments of other witnesses should be ignored in view of the obvious fact that both in 1969 and 1970 the school was seriously disrupted as a result of these auditorium presentations. Regardless of any theoretical results to be predicted in response to hypothetical questions, the actual fact is that the school was disrupted and had to be kept closed for nearly ten days. For that reason we feel our Findings and Conclusions are fully justified.

"A major defense produced by the Appellants seems to be the assumption that the students acted on their own, and some of the obscenities and unsuitable skits were not condoned by the Appellants. It is clear, however, from the Appellants' own testimony, that supervision of the skits, speeches and activities of the students was the responsibility of the Appellants. (Tr. 726.800). Both Appellants testified that one of their duties was to check the text of proposed programs. (Tr. 745, 771, 821). Appellant Harrod testified that Mr. Nelson (Principal) said he would mark the sponsors "unsatisfactory" if the 1970 program was not suitable "cleaned up." (Tr. 823). In view of this specific warning and the professional judgment required of teachers assuming such a sensitive responsibility, in our opinion the Appellants failed in their functions as sponsors and teachers. Perhaps in 1969 there was a misunderstanding as to what was required—but when it was repeated in 1970, after two warnings, in aggravated form, in our opinion summary action to suspend Appellants was imperative. All six administrators directly involved recommended this action.

"After full consideration of all the evidence, we are convinced the action of the Superintendent of Schools was correct and we sustain his administrative decision. By agreement the Appellants remained on the school payroll until the end of the school year, June 13, 1970, but without assignment, pending disposition of this hearing. Accordingly, they should now be permanently terminated.

"BOARD OF EDUCATION
CITY OF ST. LOUIS

/s/ Eugene Boisaubin    /s/ Elmer Pounds
Frederick E. Busse          Andrew Doyle
Mrs. Gilbert Harris         James S. Hurt
Reverend Earl E.            Ruth B. Scheetz
Nance, Sr.
Adelia T. Smiley            Wallace Schoenbeck
Daniel L. Schlafly          Malcolm W. Martin"

Appellants raise two points on this appeal: (1) the Board failed to make concise

statements of the findings of fact on which the Board based its conclusions and order; (2) the Findings of Fact are not supported by competent and substantial evidence.

As to the first point, appellants contend that the Board's findings numbered 3, 4, 7, and 10 are conclusions and are therefore an improper basis for conclusions of law. They argue that words and phrases used therein such as "racist", "inflammatory", "racial disharmony", and "divisive effect" do not qualify as Findings of Fact. While we agree that these words and phrases can be considered conclusionary, the test to be applied is whether the Findings of Facts fairly informed the appellants of the basis for the Board's order. In State ex rel St. Louis Public Service Company v. Public Service Commission, 365 Mo. 1032, 291 S.W.2d 95 (banc 1956) our Supreme Court in construing § 536.090 of the Administrative Procedure Act stated at p. 98:

"For our purposes, the decisive matter is that we had no difficulty in determining from the Commission's report and order the findings upon which that order was based, and, consequently, we hold that the report and order in this case, considered as a whole, are sufficient for our review. * * * "

We believe the Findings of Fact, the Conclusions of Law and the order entered against the appellants fairly informed the appellants of the basis for its decision and are sufficient for our review. Appellants' point 1 is denied.

As to appellants second point that the findings of the Board are not supported by competent and substantial evidence we point out that the guidelines for our review were reiterated by our Supreme Court in Tom Boy, Inc. v. Quinn, 431 S. W.2d 221 (Mo. banc 1968) wherein the court stated at page 225:

"The scope of our review in this case extends to determination of whether the findings and decision of the Commission-

er are supported by competent and substantial evidence upon the whole record, and authorized by law. We may not substitute our judgment on the evidence for that of the Commissioner and we may not set aside his decision, unless it is not supported by competent and substantial evidence on the whole record, or it is not authorized by law, is arbitrary, capricious or involves an abuse of discretion. State ex rel. Favazza v. Ketchum, Mo., 367 S.W.2d 542, 546 [2, 3]; Pinzino v. Supervisor of Liquor Control, Mo., 334 S.W.2d 20, 26 [4]; Baker & Theodore, Inc., v. Quinn, Mo.App., 400 S.W. 2d 477, 479–480 [1].

"In reviewing the Commissioner's decision to determine whether it and his findings are supported by competent and substantial evidence we consider the evidence in a light most favorable to his decision, together with all reasonable inferences which support it. State ex. rel. Favazza v. Ketchum, supra, 1. c. 546 [4]; Baker & Theodore, Inc., v. Quinn, supra, 1. c. 480 [6]."

We state the facts in accordance with this mandate. In the Fall of 1968 a number of students obtained permission to form an Afro-American Club. The facts of this case revolve around the presentation of two programs by the Afro-American Club (later called the Black Student Union) before the student body of Beaumont High School. These programs were presented during Black History week in 1969 and 1970. Appellants Harrod and Buchanan were sponsors for this group for both years.

Dr. William Kottmeyer, Superintendent of Schools, stated that it is generally understood through the school system that sponsors of extra-curricular groups are responsible for their activities and are responsible for their supervision and guidance, and the sponsors must keep these groups in harmony with the spirit and letter of the curricular arrangement of the school system.

In late 1968 or early 1969, the Club obtained permission from the principal, Mr. Meinhardt, to present a program during an auditorium session during Black History week in February 1969. The sponsors of the club along with the students prepared a program which was presented in the auditorium. Prior to the 1969 program a conference was held by Mr. Meinhardt with the two sponsors and others regarding the program to be presented. They were instructed that no outsiders (non-students) were to participate in the program. The program was to show the accomplishments of Blacks.

An account of this program was given by Mr. Leonard Mershon, Administrative Assistant at Beaumont. At the beginning of the program the sponsors were on the stage. The first speaker, was a student, Mark Jones, who introduced himself as the Prime Minister and stated that the Blacks had to destroy the Whites before the black man could make progress. There was testimony that appellant Buchanan attempted to get Mark Jones off the stage. However, appellant Buchanan testified on cross-examination that he did not believe the language in this speech that "the white man was the natural enemy of the black man, [and] if the white man wasn't destroyed the black man, in effect would get nowhere" would stir up racial animosity.

There was also a scene in which hooded riders described as the Ku Klux Klan were kicking a black boy.

The Black Artists Group who were a non-student group performed. This group put on a robbery skit which consisted of all Blacks. The dialogue was that Blacks should not attempt to destroy Blacks. This group used profanity using the words "mother-fucker" repeatedly. Mr. Mershon, who was "in and out" during the presentation of the 1969 program, testified that the program was objectionable, and "I didn't think it was the type of program that was educational to any high school."

There were other skits presented depicting events in the lives of Touissant L'Overture, Harriet Tubman, Nat Turner, Sojourner Truth, Rosa Parks, and a skit entitled "In White America." There were also speeches and poems, one of which was entitled "Ballad of a Landlord." During the Nat Turner skit, it reported that he was skinned like an animal.

During the hearing before the Board, a number of witnesses were presented with the transcript of the skits and speeches at the 1969 program and requested to give a judgment as to whether the skits promoted racial discord and hatred. A number of witnesses including school officials found the material appropriate.

However, Mrs. Brasfield, assistant principal, found Mr. Mark Jones' taped speech to be objectionable and was of the opinion that portions of the speech when viewed in the light of the racial conditions at Beaumont could incite students to disruption and would foster disrespect for the school administrators. Dr. William Kottmeyer, School Superintendent, also stated that in his judgment the speech fostered racial disharmony and promoted disrespect. Dr. Kottmeyer also found material in the skits Sojourner Truth, Rosa Parks and "In White America" not calculated to produce racial harmony. He also stated that material "In White America" would cause racial disharmony.

Mr. Mershon found the material in the Nat Turner skit objectionable where it reported Turner as being skinned like an animal. He was also of the opinion that the testimony of Mrs. Tutson in the "In White America" skit relating to a beating was calculated to inflame racial hatred.

During the presentation of the 1969 program a number of Black and white teachers were disgusted with the program and walked out of the auditorium. At the conclusion of the program a white boy was attacked as he attempted to leave the building, and he "had blood on his face."

As a result of the 1969 program teachers were upset and demoralized. Beaumont teacher resignations and requests for transfers to other schools were much higher than in any other St. Louis Public High School. The authority of the teacher was undermined. Discipline problems with the students increased. A number of teachers complained to Mr. Mershon about the program and asked him, "how in the world teachers could be sponsors and permit a program of that sort to be presented to a high school?"

The day following the play, Mr. Meinhardt called the plaintiffs into his office and told them that he was hurt by the presentation of the program. The next day Mr. Mershon met with the sponsors for an hour and a half and told them it was not the kind of program which had been outlined.

The plaintiffs received efficiency ratings of average and above average about two weeks after the 1969 program. However, Dr. Kottmeyer explained that teacher efficiency ratings are primarily based upon the efficiency of the teacher in the classroom.

Among the findings of the Board was that inflammatory pictures were posted on the wall of room 104 which had been used by the Black Student Union. The evidence as to this finding was that on a large bulletin board of room 104, the home room of the Black Student Union, there were numerous 8" x 10" photos which were described as "hate pictures" and objectionable. The pictures were introduced into evidence and examined by this Court. Many of the pictures were from the Black Panther Party. One picture showed pigs dressed as police. Another photo described as "Pig Justice" showed a pig dressed as a judge with lady justice placing money on the scale of justice; it referred to the trial of Huey Newton, Bobby Seale and Eldridge Cleaver. It contained these words: "Hear the Trumped-up Charges—See the Juries of Non-Peers . . . See the Fascist Judges And Their Running Dog Prosecutors Railroad The Vanguard Revolutionar-

ies." Another photo showed a number of pigs dressed as policemen shouting "niggers, niggers." On this photo was written "Kill oink, kill oink." Another photo showed a black youth strangling a pig dressed as a policeman and stabbing him in the back of the neck. The pictures were described as calculating to foment racial discord.

It is true that room 104 was used as a study hall by other student groups; however, a teacher testified that a member of the Black Student Union put up a number of these photos on the bulletin board. The pictures had been there for about a year and a half and were there two days before the 1970 program. This room was the meeting room of the Black Student Union.

After the 1969 program, Mr. Clifford Evans, District Superintendent, in the course of his weekly meetings with Dr. Kottmeyer frequently expressed grave concern about the considerable disharmony at Beaumont which was reflected in the discipline problems of the school. Mr. Evans attributed a great deal of difficulty at Beaumont to the discord caused by the sponsors of the Black Student Union. He expressed the fear that the school would be totally disrupted if greater effort were not made to control the situation.

Prior to the 1970 program, Mr. Evans spoke to Mr. Nelson, the newly appointed principal at Beaumont and told him to inform the sponsors that the same kind of program as put on in 1969 would not be permitted.

In the Fall of 1969, Mr. Nelson told appellant Harrod that he would like the Black Student Union to present an auditorium program during black history week in February, 1970. And, in accordance with his instructions from Mr. Evans, Mr. Nelson in January, 1970 warned the appellants to avoid any program such as had been presented in 1969. The appellants were instructed that the program was to stress "black awareness" but to be "void of hate." In January, 1970, Mr. Nelson pointed out

to appellant Harrod and others that the program was to make young blacks feel proud but he did not want any activity that would emphasize hate nor degrade any ethnic group and the program should stress living together harmoniously.

Mrs. Brasfield met with the appellants twice in January, 1970 for the purpose of determining the format and guidelines for the program. The students gave the skits to the sponsors on February 3 or 4.

On February 6, 1970, Mr. Nelson and Mrs. Brasfield attended a rehearsal of the program. Mr. Nelson was present for part of the rehearsal; Mrs. Brasfield saw the complete rehearsal. Both found the program objectionable. Mrs. Brasfield found the program obscene and racially inflammatory. During the rehearsal, the sponsors were on the stage assisting the students in the presentation. At no time during the rehearsal did the sponsors object or tell the students they could not put on this type of program.

During the rehearsal a speaker denounced the principal and condemned the Constitution. Another speaker stated that Blacks were the victims of mistreatment by the white man. Another skit called the "Oklahoma Shootout" involved a confrontation of Huey Newton, the Black Panther Party and the police. Mrs. Brasfield stated that this skit portrayed the white man's mistreatment and brutality towards the black man and would encourage and stir up racial discord and disharmony. The term racist pig was frequently used as well as "mother f-----."

There was a court room scene with the judge referred to as a racist pig. "Mother f-----" and "nigger" were frequently used. This skit again emphasized the brutality and mistreatment of the black man by the white man.

The next skit was the classroom skit. There were about 25 students of the Black Student Union in it and a girl who played the part of a white woman teacher. The teacher made derogatory remarks to the students telling them that they were ignorant and they were too dumb to understand. The students used the words "God D---" and "Mother f-----" toward the teacher and physically dragged the teacher out of the room. The skit again carried out the scheme of the white man's mistreatment of the black man.

Mrs. Brasfield found the program as presented in the rehearsal obscene and racially inflammatory. She reported to Mr. Nelson, the principal, that the program was very similar to the 1969 program. Mr. Nelson met with the appellant Harrod and other school officials this same day (February 6) and warned that the program was contrary to the guidelines; that there was to be no program presented which would stir up racial disharmony and discord; that the program was not to reflect on any ethnic group; that the sponsors would be held responsible for the program; and, that the program had to be "cleaned up."

Appellant Harrod asked Mrs. Brasfield to appear before the Black Student Union and outline the objections to the program which she did on February 10. Mrs. Brasfield was told by the secretary of the Black Student Union that it would refuse to change the program and it would not present a program.

This program was then cancelled and a substitute program arranged. However, on the morning of February 12, Mrs. Brasfield found a number of students from the Black Student Union on the stage prepared to put on a program. Mrs. Brasfield reported this fact to Mr. Nelson. Appellants Harrod and Buchanan were sent by Mr. Nelson to the stage to again inform the Black Student Union that their program was cancelled. The appellants and Mrs. Brasfield went to the stage but found only one student there. The appellants were told to remain with their students in the audience.

However, when the program was about to begin, a number of members of the

**10**

Black Student Union were found behind the stage preparing to put on its program. Mr. Nelson met with these students backstage and after being told by the students that they would "clean up" the program, Mr. Nelson told them to go ahead and present their program. Mr. Evans, District Superintendent, stated that it was Mr. Nelson's responsibility to authorize the presentation of this program.

The actual presentation on February 12, 1970 was substantially the same as presented in the rehearsal. Specifically the "Oklahoma Shootout" skit, the classroom skit and the court room skit were presented. The teacher had white powder on her face and the judge was "in white face." The words "mother f-----" and "God D---" were again used.

Mr. Gregory, Assistant District Superintendent corroborated Mrs. Brasfield's description of the program. The speakers denounced the school authorities as being dictators and the United States Constitution as being an "archiac, decrepit piece of paper." Another speaker stated that the only way the black man could get along in the white man's society was to "eat boody and give up boody to the faggot punk establishment." He stated that "the Man [has been] hanging you for 100 years, and this is what you deserve for being such damn fools."

Mr. Gregory described the classroom scene as verbal sparring between the teacher and the students. The students became enraged and hurled epithets at the white teacher. Several students "jumped from their seats, assaulted her and dragged her off the stage." The skits were "laced with obscenities and profanity." A girl member of the Black Student Union recited a poem entitled "Prayer to the White Man's God" with the punch line: "I know Jesus heard me, because he spit right in my eye."

When Mr. Nelson tried to end the program, a member of the Black Student Union defied the principal and told the students they did not have to leave the auditorium. Disorder resulted. There was a fire in the off-stage storeroom and the smoke filled the building. Property was damaged in the school; two lunchroom workers were injured in trying to exit the building; a teacher was hospitalized for smoke inhalation. As a result, the school was forced to close for ten days.

Both appellants admitted that they were responsible for the supervision of the program. However, they both stated that they had nothing to do with the preparation of the program after February 6. They also stated that the students presented a number of controversial skits which the sponsors had "cut out" of the program.

■ We are convinced the charges and findings of the Board are abundantly supported by competent and substantial evidence. The evidence is clear that the 1969 program was racially inflammatory and obscene. Both black and white teachers walked out of the auditorium in disgust. The appellants were actively in charge of this program and were on the stage assisting in the presentation. Racial discord, discipline problems and disrespect for the school administration resulted.

In preparation for the 1970 program the appellants were warned by school officials not to repeat any program as had been presented in 1969. The appellants were instructed that the 1970 program was to stress "black awareness", to avoid hate, and to emphasize living together harmoniously. They were told that they would be responsible for the program. Contrary to their duties and the instructions given them the appellants *permitted the development* of the 1970 program which was more inflammatory than the 1969 program. While the appellants were *not in active* charge of the program at the time of its presentation, they cannot be relieved of the responsibility for the development of this obscene and racially oriented program. The rehearsal on February 6 clearly demonstrated that the appellants permitted the development of a program which was high-

ly inflammatory, obscene and racist oriented. The rehearsal program was substantially the same as the program actually performed on February 12. At no time during the rehearsal did the appellants object to the program or tell the students that they could not put on this type of program. This indicates that the sponsors approved the program.

It is interesting to note that when the school authorities found the rehearsal objectionable, and obscene and so informed the appellants, it was the appellant Harrod who asked the school authorities to inform the Black Student Union of their objections to the programs rather than inform the Union himself. This again indicates that appellant Harrod did not disapprove of the program as presented in the rehearsal.

The 1970 program which was developed under the appellants ended in disorder and chaos, the principal's authority was defied, a fire was set, school property damaged, personal injuries inflicted and the school was forced to close.

We are convinced that the appellants being responsible for the development of the 1970 program and being forewarned not to permit racially oriented programs, are thus responsible for setting in motion the forces which resulted in the presentation of the racially inflammatory and obscene program in 1970.

For the reasons stated, we hold that the findings and decision of the Board are supported by competent and substantial evidence. The judgment is affirmed.

SMITH and CLEMENS, JJ., concur.

WEIER, KELLY and GUNN, JJ., concur in majority opinion and in separate concurring opinion.

SIMEONE, J., concurs in separate concurring opinion.

McMILLIAN, J., dissents.

SIMEONE, Judge (concurring).

I concur in the result reached by the majority in holding that the findings and decision of the Board terminating the employment of the appellants are supported by competent and substantial evidence. To reach this conclusion has been, for me, an agonizing struggle, for involved is the delicate balancing of the tenure rights of teachers in a secondary school and the right of the school board to control the operation of a school so that the educational process, so vital to our society, may be carried on in the quiet and harmony essential to learning.

Intertwined and implicit in this proceeding, although not primarily in issue and not raised, is the right of faculty and students to exercise their constitutional rights of free expression.

There are certain basics. Our review is limited; limited to a determination of whether the findings and the decision of the Board to terminate appellants' services are supported by competent and substantial evidence upon the whole record. School boards have the power to exercise their judgment and discretion in matters affecting school management and a court may not interfere unless the Board exercises such powers in an unreasonable, arbitrary, capricious or unlawful manner. Magenheim v. Board of Education, 347 S.W.2d 409, 417 (Mo.App.1961). As the majority opinion correctly points out, we may not substitute our judgment for that of the Board and we may not set aside its findings and judgment unless there is no substantial evidence for it to reach the conclusion it did. The Board has broad discretion to make decisions but that discretion is not unbounded. Standards and good reasons exist to control unbounded authority.

While not precisely in issue in this proceeding, it is now settled that "First Amendment rights, applied in light of the special characteristics of the school environment, are available to teachers and students. It can hardly be argued that either

students or teachers shed their constitutional rights to freedom of speech or expression at the schoolhouse gate." Tinker v. Des Moines Independent Community School Dist., 393 U.S. 503, 506, 89 S.Ct. 733, 736, 21 L.Ed.2d 731 (1969); Vail v. Board of Education of Portsmouth School Dist., 354 F.Supp. 592, 597 (D.N.H. 1973). But these rights, like all in the law, are not absolute and "the [Supreme] Court has repeatedly emphasized the need for affirming the comprehensive authority of . . . school officials, . . . to prescribe and control conduct in the schools." *Tinker,* supra 393 U.S. at 507, 89 S.Ct. at 737. There are times when, and there are reasons why, a Board may restrict these freedoms.

The precise issue here is the right of the School Board to terminate the services of tenured teachers. That right is undoubted provided the termination falls within the ambit of the law, is reasonable, procedural due process is afforded and is for good cause. See cases collected in Annot., 4 A. L.R.3d 1090 (1965); § 168.221, RSMo 1969, V.A.M.S. and Regulations of the Department of Instruction, St. Louis Public Schools, Secondary Division (1968), Rules 2.330, 3.100 and 3.240. Innumerable decisions have upheld the right of a board to terminate the services of a teacher in both secondary and college institutions for good and sufficient cause. And a faculty advisor may be held responsible for the activities of the students under his supervision. Jergeson v. Board of Trustees of School Dist. No. 7, 476 P.2d 481 (Wyo.1970). Passive neglect as well as affirmative misfeasance may be sufficient to hold the advisor or sponsor responsible.

Under this record and the facts, the Board had reason to take steps in 1970 to minimize the possibility of new discord in a troubled school. And under this record, there was sufficient and competent evidence to substantiate the charges and the termination of the services of the appellants. No one denies that appellants were sponsors and faculty advisors. Appellants were instructed in 1970 not to present a program similar to the one in 1969. There was sufficient evidence for the Board to reach the conclusion that appellants permitted the development of the 1970 presentation in disregard of instructions to avoid repetition of the earlier program. This notwithstanding the fact that Mr. Nelson permitted the presentation after having been told that the students would "clean up" the program. While there may be differences of opinion on the obscene or disruptive nature of the program, determination had to be made by the Board in the context of the situation and such judgment was made by the Board. There is evidence that appellants knew of the program by February 3 or 4 and knew of the program at the time of the rehearsal or preview on February 6, 1970. Appellants, charged with the responsibility as sponsors, were under directions of the school authorities not to put on a similar program, and by reason of the February 6 rehearsal they knew that the same type of presentation was planned.

While there is, of course, a legitimate place in our schools for free academic expression and dramatizations of historical and contemporary events, and dramatizations of the culture and proud heritage of any ethnic group, as a part of the learning process, expressions or dramatizations, or their method of exercise cannot be disruptive or materially interfere with the legitimate educational endeavors.

Teachers are unique in society. A teacher works in a sensitive area; in his environment he shapes the attitudes of young people toward the society in which they live. He is afforded special privileges —academic freedom and academic tenure. But he also bears responsibilities. And within definite bounds, he is subject to certain reasonable controls of the Board by whom he is employed, which has the responsibility of providing a good education for all young people within its jurisdiction.

The Board held a lengthy hearing. Appellants were afforded procedural due

process. The Board exercised its judgment to terminate the services of the appellants by a unanimous vote. I believe that the judgment of the members of the Board was supported by competent and substantial evidence on the whole record.

I therefore concur in the result reached by the majority.

McMILLIAN, Judge (dissenting).

I dissent.

The crux of plaintiffs' appeal is that the School Board's action in sustaining the administrative decision of defendant Kottmeyer and in permanently terminating the plaintiffs' employment was improper in that certain essential findings of fact were not supported by competent and substantial evidence on the whole record and thus failed to substantiate the charges brought by defendant Kottmeyer on which plaintiffs' dismissal was based.

The question thus presented to this court is, was there competent and substantial evidence to support the Board's "Findings of Fact" No. 3, 4, 6, 7, 9, and 10? While I am in basic agreement with the guidelines set forth by the Missouri Supreme Court in Tom Boy, Inc. v. Quinn, 431 S.W.2d 221 (Mo. banc 1968) for the review of administrative decisions, cited by the majority, I feel that the statement by this court in Dittmeier v. Missouri Real Estate Commission, 237 S.W.2d 201, 203 (Mo.App.1951) adds an additional criterion to those guidelines which the majority opinion has failed to consider. In the Dittmeier case we stated that, " . . . Although the reviewing court cannot substitute its own judgment for that of the administrative tribunal, and should adhere to the rule of due deference to findings of fact involving the credibility of witnesses, *its duty is to determine whether the tribunal reasonably could have made its findings and reached its result upon consideration of all of the evidence before it and to set aside decisions clearly against the overwhelming weight of the evidence.*

(Emphasis added.) Wood v. Wagner Elec. Corp., 355 Mo. 670, 197 S.W.2d 647; Williams v. International Shoe Co., Mo.App., 213 S.W.2d 657, loc. cit. 662; Dyche v. Bostian, Mo.Sup., 233 S.W.2d 721. . . ." It is this writer's opinion that the Board acted unreasonably in reaching the result it did and that the decision of the Board in this instance was arbitrary and capricious in that findings Nos. 3, 4, 6, 7, 9, and 10 were clearly against the overwhelming weight of the evidence and were not supported by competent and substantial evidence on the record as a whole.

Findings of Fact Nos. 3 and 4 concerned the 1969 auditorium session. The skits in the 1969 program depicted certain events and incidents in the lives of such black historical figures as Sojourner Truth, Nat Turner, Harriet Tubman, Rosa Parks and Dr. Martin Luther King, Jr. From a reading of the scripts it appears that the skits *accurately* dramatize important events in the history of this country and as such are certainly the proper subject for a high school auditorium session commemorating Black History Week.

It is my opinion that, as to the 1969 auditorium session, the majority failed to consider the record as a whole in reviewing the Board's Finding No. 3 that the auditorium session was "racist, inflammatory and promoted racial disharmony." The majority opinion obviously feels that Dr. Kottmeyer's observations on the propriety and the content of these skits is definitive and conclusive. The record must be viewed as a whole in order to properly review the findings of the Board.

At the Board's hearing defendant Dr. Kottmeyer, Mr. Evans, a district superintendent; Mr. Mershon, assistant principal at Beaumont High School and Mrs. Blow, a teacher at Beaumont High School, were asked to read the skits that were presented at the 1969 auditorium session and to give their opinions as to whether or not they found the skits objectionable, and whether or not they felt that the skits promoted racial discord and hatred.

As to the Nat Turner skit, Dr. Kottmeyer was unable to make a judgment; Mr. Mershon objected to part of the skit; Mrs. Blow and Mr. Evans found the material acceptable. As to the Harriet Tubman skit, Dr. Kottmeyer said that the material was not calculated to produce racial harmony; Mr. Mershon found the material appropriate and Mrs. Blow and Mr. Evans found the material to be acceptable. As to the Sojourner Truth skit, Dr. Kottmeyer said that the material would not be calculated to produce racial harmony; Mr. Mershon, Mrs. Blow and Mr. Evans found the material appropriate.

The skit that caused the most controversy was a scene from "In White America" by Martin Duberman. Dr. Kottmeyer stated that the material was not calculated to promote racial harmony. Mr. Mershon testified that part of the skit was calculated to inflame racial hatred. Mr. Evans found the material appropriate for a small class, but not for an auditorium session. Three witnesses called by plaintiffs: Mrs. Pearlie Evans, a Commissioner of Community Service and Housing Relocation, the City of St. Louis, a National Vice President, National Association for Social Workers and a member, National Commission for Racial Justice; Mr. Andy Brown, Commissioner of Human Relations, the City of St. Louis, a resident of the City of St. Louis for 43 years; and Mr. Jack Kirkland, Assistant Professor of Social Work, St. Louis University and past member of the School Board of University City, Missouri, testified that they found the skit "In White America" to be educational and appropriate for use anywhere.

I think that it is important to point out that the events portrayed in the 1969 skits are part of America's history. Nat Turner was hanged after his slave rebellion was crushed in Virginia in 1831. Turner's body was given to surgeons for dissection and souvenir purses were made out of the skin. Turner's skull was allegedly placed in the Southampton County Courthouse. The material for the skit "In White Amer-

ica" was taken from two sources: (1) the K.K.K. oath and the first testimony were from " 'Official Report of the Proceeding in the Ku Klux Trials. . . . Before United States Circuit Court . . . Held at Columbia, South Carolina, November Term 1871.' " and (2) Mrs. Tutson's account is in "Testimony Taken by the Joint Select Committee to Inquire into the Conditions of Affairs in the Late Insurrectionary States (Wash: 1872), II, 59–64." Past events in the history of this country, whether glorious or ignominious cannot be avoided or swept under the carpet. If the purpose of our educational system is to truly educate the individual, then the individual must be exposed to the truth and then permitted, with the proper guidance, to make his own judgment on the course of events in the history of this country.

The students at Beaumont High School who viewed this auditorium session were in their junior and senior years, approximately ages 16–18. For many of these students, Beaumont High School would be their last contact with any form of formal education. As young adults these students needed to be exposed to the widest possible range of experiences and ideas in order to help them grow intellectually and emotionally. To deprive them of these opportunities would be to thwart the purpose and intent of our educational system. To avoid confronting these students with the truth is to do a great disservice not only to the students but to the entire community as well.

From my review of the record there appears to be one major criticism of the speeches and poems given at the 1969 session; that criticism concerns the speech made by Mark Jones. The record indicates that Mark Jones departed from the prepared text of his speech and made a statement to the effect that it would be necessary to destroy whites before the black man could make progress. Mark Jones' statement was a departure from the prepared text of his speech. The plaintiffs were surprised and plaintiff Buchanan attempted to drag Mark Jones off the stage

after that statement was made. It is incomprehensible to me how the sponsors of the Afro-American Club could be held responsible for an admittedly spontaneous remark made by a student that departed from the prepared text of his speech. Mr. Buchanan's actions in attempting to drag Mark Jones off the stage and attempting to silence Jones clearly indicates his disapproval of Mark Jones' statements.

Further, the record fails to support the charges made by the Board that the sponsors assisted in the presentation of a program which was obscene and calculated to inflame racial discord and hatred. The obscenity issue in the charges leveled by the Board barely warrants comment. Under any judicial test of obscenity that this writer is familiar with, no part of the 1969 auditorium session was in any way obscene. Obscenities allegedly were used in the 1969 session but this fact hardly qualifies the program as obscene. As to the element of the charge that alleges calculation to inflame racial discord and hatred, there was not a scintilla of evidence presented to show any intention on the part of the sponsors to produce a racist program at the auditorium session.

In regards to the 1969 session, I would take issue with the majority's statement that, "as a result of the 1969 program teachers were upset and demoralized. Beaumont teacher resignations and requests for transfers to other schools were much higher than in any other St. Louis Public High School. The authority of the teacher was undermined. Discipline problems with the students increased." Dr. Kottmeyer testified that requests for transfers were much higher at Beaumont than in any other St. Louis school. His testimony implies that the 1969 program was responsible for the requests being made. There is no indication in the record that Dr. Kottmeyer ever talked to any of the teachers, who requested transfers, about their reasons for doing so. Further, not one of the teachers who requested a transfer from Beaumont testified at the hearing

as to their motivation for seeking transfers. I think that the conclusion drawn by Dr. Kottmeyer is an unsubstantiated one and a highly prejudicial one.

Mr. Leonard Mershon, an administrative assistant at Beaumont, testified that the authority of the teachers was undermined and that there were increased disciplinary problems among the students. Mr. Mershon's testimony fails to establish or even disclose any causal connection between the 1969 session and these disciplinary problems. Mr. Mershon's conclusion about the reasons for the increase in disciplinary problems is unsupported by evidence in the record.

The majority points out that about two weeks after the 1969 program the plaintiffs received efficiency ratings of average and above average. The majority attempts to explain this away by stating that these ratings were based primarily upon the efficiency of the teacher in the classroom. If efficiency in the classroom was only *primarily* the basis for these ratings and not the sole criterion for grading teacher efficiency, why didn't below average and critical remarks appear for those aspects of the teacher's job performance that were not concerned solely with classroom efficiency. (i. e., supervision of students in extracurricular activities as the ability to handle students in a situation outside the classroom.)

Findings of Fact No. 9 found that "Inflammatory pictures were posted on wall of Room 104, home of Black Student Union, for period of time." The majority opinion takes great pain in pointing out that this court examined the pictures that were posted on the walls of Room 104 and what the content of those pictures was. However, after vividly detailing the contents of the pictures the majority states that: (1) Room 104 was used as a study hall by other student groups; and (2) that the pictures had been upon the bulletin board for over a year and a half prior to the 1970 program. The majority's opinion

raises two interesting questions: (1) Isn't it possible that at least some, if not most, of the so-called inflammatory pictures might have been posted by students other than members of the Black Student Union; and (2) if the pictures were so inflammatory as to foment racial discord why did the school administration allow the pictures to remain posted for a year and a half in an open classroom? And why were the plaintiffs not advised of the administration's objections to the pictures?

The Board of Education, in its Findings of Facts No. 7 and 10, found that the "Auditorium session produced by the Black Student Union in 1970 promoted racial disharmony, and resulted in fire, injuries and closing of school for substantial period of time" and "Not withstanding expert testimony that skits presented at auditorium sessions would not inflame racial disharmony, resulting disturbances did occur immediately following such sessions in both 1969 and 1970."

In the Fall of 1969 the plaintiffs were approached by Mr. Nelson, the new principal at Beaumont, who requested that the Black Student Union present an auditorium session during Black History Week. In the middle of January, 1970 a meeting was held in which Mrs. Brasfield, the coordinator of the program, discussed the contents of the program and the time schedule. Thereafter, the plaintiffs met with the Black Student Union and requested volunteers to write skits for the program. The skits were turned in to the sponsors on February 3rd or 4th and a rehearsal was held on February 6th.

At the rehearsal on February 6, 1970, Mr. Nelson and his staff advised plaintiffs that the program as presented was unacceptable and had to be cleaned up. Mr. Harrod asked Mrs. Brasfield to appear before the Black Student Union and outline the objections to the program which she did on February 10. After Mrs. Brasfield delivered her directive to the members of the Black Student Union, they voted not to present the session. At the time the vote was taken the plaintiffs were absent due to the fact that they were assigned to tutor students at other high schools. After learning of the decision of the Black Student Union, Mr. Nelson made arrangements for a substitute program.

On the morning of the auditorium session the plaintiffs were instructed by Mr. Nelson to bring their homeroom groups to the auditorium and to sit with them in the audience. Immediately prior to the commencement of the program, Mr. Nelson went backstage and found several members of the Black Student Union on the stage. The following occurred:

Mr. Nelson: "And I mentioned to several of the students, and I don't remember any particular student, I talked specifically with the young man who was in charge and after some conversation he said to me, said, 'Well, Mr. Nelson, we will clean it up. We will clean it up.' And he said, 'I hope everything will go all right, we will clean it up, we will clean it up.' After some discussion. . ."

\* \* \* \* \* \*

"After the young man's statement that he felt they would clean it up, I told him to go right ahead because we wanted the program. . . just move right ahead with the original program."

The program that followed included speeches and some of the skits that were done in rehearsal and others that were not. Admittedly the skits were of a rather violent nature and contained a great number of obscenities. Mr. Nelson attempted to halt the program and a student tried to shout him down. The situation became very confused as some students refused to leave the auditorium. A small fire was set in a storeroom behind the stage and some damage to personal property was done. That evening the plaintiffs were notified by Dr. Kottmeyer that their services were being terminated as of that date.

I find from the evidence that it was the decision of the principal, Mr. Nelson, that the program be presented. Mr. Nelson had

ordered that the program be cleaned up and the members of the Black Student Union refused. Mr. Nelson then arranged for a substitute program and so advised the plaintiffs. Mr. Nelson even assigned the plaintiffs to other duties during the auditorium session. It is irrefutable from Mr. Nelson's own testimony that he granted the Black Student Union permission to present their program after he had originally cancelled that program.

The majority opinion stresses that the plaintiffs permitted the development of the 1970 program which was more inflammatory than the 1969 program. The majority concedes that the plaintiffs were not in active charge of the program at the time of its presentation. However, the majority contends that the plaintiffs are responsible for the development of a program that was highly inflammatory, obscene and racist oriented. However, the uncontroverted evidence in the record shows that the sponsors cut out some of the skits that were originally submitted to them on February 4 and 5. The evidence further indicates that some of the skits presented at the rehearsal had not been submitted to the sponsors. In thoroughly searching the record in this case, I find (1) that there was no evidence that the plaintiffs or either of them were instrumental in "setting in motion the forces which resulted in the presentation of a program as inflammatory and obscene" and (2) that plaintiffs or either of them had any control over the program's content or the students' decision to go ahead. The Board did not have competent and substantial evidence on which to base its "Findings of Fact" and the charges brought by Dr. Kottmeyer were not substantiated by evidence presented to the Board. It is my opinion that the Board could not have reasonably made its findings and reached its result upon considera-tion of all the evidence before it. The Board's decision in upholding the suspension and permanent termination of the appellants' services was clearly against the overwhelming weight of the evidence.

I am fully aware of the broad powers and authority that the School Board possesses. The School Board is charged with a heavy responsibility and their job is not an easy one. I certainly would not quarrel with the statement in the concurring opinion that the School Board has the right to terminate the services of tenured teachers. However, it is my strong conviction, supported by a careful review of the record as a whole, that the evidence presented to the Board completely failed to substantiate the charges brought against the plaintiffs. The Board could not have seriously considered the record as a whole and still reached the conclusion that it did. In this instance the Board grossly abused its discretion and acted in an arbitrary and capricious manner.

By upholding the Findings of the Board, this court has seriously affected the rights of the plaintiffs. The rights of the plaintiffs were, by and large, ignored by the majority opinion which showed a marked preoccupation with maintaining the power of the School Board no matter in what manner the Board acted. To terminate the employment of tenured teachers, good cause must be shown. The rights of tenured teachers are not absolute, their conduct is unquestionably subject to control by administrative authority. However, teacher rights may not be abrogated by a School Board that acts arbitrarily and capriciously where there is an absence of competent and substantial evidence to terminate the right to continued employment.

For the reasons listed, I would reverse the decision.